LINDA CARLSON, Plaintiff-Appellant, *v.* GENERAL MOTORS CORPORATION *et al.*, Defendants-Appellees.

(No. 54140;

First District—September 29, 1972.

*Modified upon denial of rehearing December 1, 1972.*

Louis G. Davidson, of Chicago, and Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, (Sidney Robin and Keith L. Davidson, of counsel,) for appellant.

Lord, Bissell & Brook, of Chicago, (Forrest L. Tozer, Richard E. Mueller, and R. R. McMahan, of counsel,) for appellee General Motors.

Kirkland, Ellis, Hodson, Chaffetz & Masters, for Chicago, (Caryl P. Bonotto and Leo K. Wykell, of counsel,) for appellee Irving Air Chute Company.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Plaintiff, Linda Carlson, appeals from a directed verdict for defendant Irving Air Chute Company, Inc., (hereafter Irving) entered at the close of all the evidence and a jury verdict in favor of defendant General Motors Corporation (hereafter GM). This action arose out of an automobile accident on March 22, 1965, wherein plaintiff sustained permanent paralysis from her neck down to her feet and during subsequent treatment had her left leg amputated above the knee. The complaint against both defendants contained counts of negligence and strict product liability and sought damages in the amount of $2,000,000. In substance the complaint alleged that plaintiff's injuries were proximately caused by a negligently designed or an unreasonably dangerous defective seat belt which broke when her automobile left the highway and collided with certain objects, causing her to be thrown from the car rather than holding her securely and safely in the driver's seat. Irving was the

manufacturer of the seat belt and GM was the manufacturer of plaintiff's 1965 Corvair in which the belt was installed.

The seat belt in question can be described as follows: The left half of the belt is connected to the floor of the car at a metal triangular anchor plate located at a point just behind the left edge of the driver's seat. The anchor plate has a slot through which the webbing of the belt is passed and sewn back onto itself in a loop, about four inches above the plate. A plastic piece, the sewing cover,[1] covers this looped area. After the sewing cover the remainder of the webbing runs to a metal fitting called a D ring because it is shaped like the letter D. The webbing passes through a slot in the D ring and is sewn back onto itself. The right half of the belt is the buckle half. It is attached to the floor in a fashion similar to the left half. The subject belt broke at a point three-quarters of an inch above the sewing cover on the left half of the belt.

Plaintiff's theory of the case was that the belt broke when the driver's seat slid toward the driver's door during the accident causing the belt to be pinched between the side-arm or side-bar (the metal piece shaped like a hockey stick on the left side of the driver's seat and a screwhead on the inboard side of the mud sill, a strip of metal running along the bottom of the door opening; that this pinch resulted in the belt breaking at a load force well below the limits required by law; that this damaging pinch would have been prevented had the belt been equipped with an inexpensive plastic piece covering the area of breakage called a "plastic boot."

GM's theory was that the belt broke at the webbing when it passed over the center pillar cover or windlace (a plastic strip located behind and extending upward from the center of the mud sill) while placed under a load force greater than that required by law; that the belt was not pinched between two metal pieces as contended by plaintiff; that plaintiff's paralytic injury was caused while she was safely secured by the seat belt.

On appeal plaintiff contends that (1) as to GM the verdict was against the manifest weight of the evidence; (2) the court erroneously excluded evidence of certain federal regulations and industry standards as to seat belts which plaintiff claims were "in force and effect" at the time the Carlson automobile was sold, while admitting "obsolete" standards from many years before; (3) the court erroneously admitted evidence of certain GM laboratory tests because they were not performed under similar conditions as those surrounding the occurrence; (4) the court erroneously admitted the opinion testimony of GM's medical expert as to the cause

---

[1] The sewing cover is not to be confused with the "plastic boot" which will be referred to shortly hereafter.

of injury because it was based upon a hypothetical state of facts not in evidence; (5) it was error for both the court and defense counsel to "continually orally instruct" the jury during voir dire examination that they must not be swayed by sympathy; (6) it was error for the court to admit certain GM laboratory tests, the results thereof and the testimony relating thereto because they were not produced for the plaintiff during discovery proceedings; (7) it was error for the court to allow two "testimonial" diagrams prepared by GM's reconstruction expert to be taken to the jury room during the jury's deliberations; (8) the court erroneously refused plaintiff's instruction that as a matter of law she was not guilty of contributory negligence nor did she assume the risk of injury; and (9) the court erroneously directed a verdict for the defendant Irving Air Chute at the close of all the evidence.

In view of the position we take as to point (6) *supra*, we will present only a summary of the facts contained in the 4500 page record. A detailed statement of facts regarding point (6) will be set forth thereafter.

On March 22, 1965, plaintiff, a 17 year old girl, and her girl friend of the same age, Marilyn Roadarmel, drove from Decatur, Illinois, to Charleston, Illinois, in plaintiff's 1965 Corvair purchased by her father on November 27, 1964. They began the return trip to Decatur at about 9:50 P.M. Both girls wore their seat belts. They traveled on Route 130 in a northerly direction; Route 130 is a two-lane highway, one lane in each direction. The car speed was approximately 50 to 55 miles per hour. There was a strong wind coming from the southwest which hit against the left side of the car. About a mile or two north of Charleston the car approached a moderate "S" curve. This area of Route 130 was not lighted nor was there any marking as to the curve. The car left the highway in an easterly direction and hit the east embankment of a ditch running parallel to the highway with the left front portion of the car. The car then began to rotate clockwise while moving in a northerly direction, but backwards. It proceeded to flip over onto its roof, pivoting on its left rear corner, and hit a small five inch by five inch road marker with the right railing of the roof. Then it flipped on its right side and the bottom of the car hit a telephone pole which was about five feet north of the road marker. When the car hit the pole, the front of the car was facing east and the driver's side was further in the air than the passenger side. The car sheared off the pole at a point about two and one-half feet above the ground. The car then came to a rest in an upright position about 50 feet past the pole, a total distance of 186 feet from where it left the highway. Marilyn Roadarmel's seat belt remained intact. She suffered minor injuries and was able to return to school within a week and one-half. Plaintiff's seat belt broke in the webbing about three-quarters

of an inch above the sewing cover on the left side. She was thrown from the car in a northeasterly direction when it hit the pole or the moment before it hit the pole and landed about 25 feet from the pole.

Robert Smith, GM's reconstruction expert, testified that plaintiff's forward force against her belt at the point it broke was about 70% greater than the passenger's on her belt. William Mathews, plaintiff's expert witness, testified that the respective forward forces were almost alike.

Mathews further testified that there were matching deformations in the side-bar of the driver's seat and the rearmost screw on the mud sill indicating that these two metal pieces had come together during the accident. The left half of the driver's seat belt rises between the side-bar and the sill; the webbing at a point three-quarters of an inch above the sewing cover (where it broke) lies between the side-bar and the screw on the sill. Based upon tests he had run and observations of the Carlson car, Mathews was of the opinion that when the car rolled over from its roof to its side, the driver's seat was pulled toward the driver's door; that this force created a pinch on the webbing between the side-bar and the screw on the sill; that this pinch plus the pulling force on the belt caused by the ejection of plaintiff from the car were sufficient to break the belt at the webbing; that the pulling force at which the belt broke was below that which the law required the belt to withstand; that had a plastic boot covered the area of pinch, the belt would not have broken at that tension level; that the absence of the plastic boot was an improper design; and that its absence left the belt in an unsafe condition.

Dr. Eugene Lutterbeck, plaintiff's witness, testified that from x-rays taken of the plaintiff he determined that the fractures to her third lumbar vertebra and the fourth and fifth cervical vertebrae were compression type fractures caused by an extreme flexion, a compressing force such as a blow to the top of the head; that there was a narrowing of the fourth and fifth cervical vertebrae which resulted in the paralysis; that there was only a remote possibility (25% chance) that these fractures causing the paralysis were caused while she was still in the car.

Dr. Donald Miller was later called on rebuttal by plaintiff. He reviewed the x-rays and corroborated Dr. Lutterbeck's testimony that the vertebral fractures were caused by a compression of these bodies when plaintiff was thrown from the car.

Dr. William Schnute, a defense witness, testified that after reviewing x-rays, he concluded that the fractures to the vertebral bodies were avulsion fractures, *i.e.*, ones caused by a snapping action such as when someone sitting in a car which is standing still is hit from behind by another car, or where a car turns over and the passenger remains stationary and

the impact of the car throws the head back. He found no narrowing in the vertebral bodies which, if present, would have been evidence of compression fractures. It was his opinion that plaintiff's paralytic injuries occurred while she was safely secured by the seat belt. Dr. Schnute's testimony was presented before that of Robert Smith, GM's reconstruction expert. In answering the hypothetical question posed to him as to causation of the paralytic injuries, Dr. Schnute was asked to assume certain facts not yet in evidence. Plaintiff's counsel objected but Dr. Schnute was allowed to express his opinion when defense counsel promised that said facts would be forthcoming at a later time, *i.e.*, during Smith's testimony.

Richard Studer, an engineer employed by GM, ran an extensive series of tests for GM. In summary, the more significant ones were designed to show that when plaintiff's belt broke in the webbing, the point of breakage could not have been located between the side-bar of the driver's seat and the screw on the mud sill; thus there was no pinch. Tests which pulled the left half of the seat belt alone, and other tests which pulled a body block (simulating a human) contained in a seat belt, at various pounds of pressure and angles, showed that when the seat (side-bar) contacted the mud sill, the area where the belt broke (the area of alleged pinch) was further to the outside of the car than plaintiff contended; it was over the center pillar cover or windlace as it is called. Studer was of the opinion that the belt broke in the webbing because it was against a hard surface (the windlace) with a pulling pressure in excess of 6000 pounds; in his deposition he stated the pulling pressure was 5000 to 7000 pounds.

In point (6) raised by plaintiff on appeal she contends that certain tests of GM should not have been admitted into evidence because they were not disclosed to plaintiff during extensive discovery proceedings. The related facts follow.

The subject accident occurred on March 22, 1965. The complaint was filed on December 9, 1966. GM filed an answer on January 13, 1967. Interrogatories were served on GM on January 25 asking for the names of any persons who had inspected plaintiff's car or seat belt and for any reports prepared pursuant thereto. Answers were returned on February 20 and March 29. A petition to advance the cause for trial was filed by plaintiff on May 1. Pursuant thereto an order was entered setting the cause for a pre-trial hearing on June 21. In June or on July 10 GM inspected plaintiff's car in Louisville, Kentucky. On October 27 plaintiff was ordered to turn over the seat belt first to Irving and then to GM for inspection and testing purposes. On November 8 plaintiff served further interrogatories on GM dealing with the design of the car frame around

the driver's seat and the design of the mud sill just inside the driver's door. Answers were returned on December 12. GM examined the seat belt in Warren, Michigan, on January 26 and 27, 1968. On April 18, 1968, the cause was set for trial on September 16, 1968. On May 20 Irving moved for the production of various items including the following:

"2. [T]he names, addresses and affiliations of all investigators, * * * consultants, and others who have knowledge of the condition of the seat belt either at the time of the automobile crash or subsequent thereto.

3. [A]ll reports, * * * and exhibits made * * * by investigators, consultants, * * * relating to the condition of the seat belt at the time of the crash * * * or prior thereto.

4. [A]ll photographs, * * * drawings * * * of plaintiff's seat belt, her vehicle, the crash scene * * *."

An order was entered pursuant thereto (applicable to all parties) requiring the production of said items but limiting the data to that intended for use at trial, and the order was complied with. Plaintiff presented GM with a 15 page report prepared by William Mathews. A portion of the report stated that during the accident a side load had caused the driver's seat to move toward the door of the car; that the left side-bar of the front seat came in contact with the mud sill; that the webbing was pinched between the side-bar and mud sill; that this resulted in a reduction of the load carrying capacity of the belt webbing; that the belt did not perform its proper function; that the failure of the webbing at a low load force was further evidenced by the lack of damage at the hardware (buckle, anchor plate) since it would fail there before failing in the webbing. He stated his opinion that the failure would not have occurred had the pinch been protected by a plastic boot cover; that the failure to provide this cover was a dangerous defect. Photographs of plaintiff's car were also given to GM.

GM produced a three page report written by Richard Studer on May 17, 1968, describing the damaged belt in detail and describing the streak patterns that were prevalent on the inside of the belt (the portion facing the driver). Photographs accompanied the report.

On July 22 plaintiff moved for an order requiring the defendants on or before August 15 to list all names and addresses of any experts, engineers, investigators, etc., who:

"* * * have knowledge of the condition of the seat belt involved * * * either at the time that the automobile crashed and/or prior thereto, and/or subsequent thereto, and for the production of a written report of any expert, consultant or other person that the defendant or any of them intends to call at the

trial * * * to render an opinion as to what might or could have caused the seat belt involved * * * to tear, shred, break or pull apart."

Plaintiff further moved for a protective order prohibiting GM from calling any expert, other than Richard Studer, from testifying as to an opinion of what caused the seat belt to break, and further asked that Studer's testimony be limited to the information and facts contained in his three page report of May 17 unless he provided plaintiff with a written report outlining in detail his opinions as to what "might or could have" caused the seat belt to break.

A lengthy hearing was held on July 22 pursuant to plaintiff's motion. GM claimed to have complied with the May 20th order since it produced the only report it had. Counsel for GM further stated that the order did not require GM to produce a report beyond the scope of relating to the condition of the belt, i.e., GM was not required to disclose its theory as to how the belt broke. Counsel for GM acknowledged that plaintiff's report did set forth her theory of the case but that this had not been required by the May 20th order. Plaintiff's counsel argued that he had revealed his litigation plans in the Mathews 15 page report; he felt GM was required to do the same. Counsel for GM informed the court that he planned to have an expert testify at trial as to facts and conclusions not contained in the three page report but that the expert testimony concerning the condition of the belt itself would be limited to that contained in the report. The motion judge stated that a protective order would be issued prohibiting Richard Studer from testifying as to anything pertaining to the condition of the belt not contained in the report. It was generally agreed that the May 20th order required the parties to produce only existing reports pertaining to the physical condition of the belt and not opinions as to why it broke. Plaintiff again requested that GM be required to produce test results regarding its theory as to the reason the belt broke. Plaintiff's counsel told the motion judge, "Well, the point is, * * * if they wait to conduct the tests [as to their theory of causation] until the day before trial, then what is plaintiff to do?" The judge responded that the trial judge would enter an appropriate sanction. The judge stated that GM would not be required to reduce the test results to writing and submit a report to plaintiff, but he suggested that if no report was forthcoming, plaintiff's concern could be obviated by taking Studer's deposition. The discussion was finally resolved with the entry of an order continuing plaintiff's motion for a protective order until a time when Studer had examined plaintiff's car and plaintiff had the opportunity to take his desposition. GM moved for permission to remove the seats from the car in order to examine their undercarriage, but, on

objection of plaintiff, wherein she represented that she had not taken the seats out of the car for any purpose, the motion was denied. The deposition was set for August 14.

On August 1 plaintiff submitted a "Bill of Particulars" to GM. It asked for (among other things) all of GM's "theories, opinions, conclusions, or estimates" as to what caused the belt to break, what "G" forces were generated within the car, what gyrations the car took, what loop load was exerted on the belt at the time it broke, and what was the position of the driver's seat during the incident.

Studer inspected the car on August 7. On August 12 plaintiff filed a motion for the production of the following documents by August 13: Any report dealing with the inspection of plaintiff's car made the previous July 1967 or August 7, 1968, and all "calculations, conclusions, estimates or results of tests," in essence, relating to the areas set forth in the August 1 "Bill of Particulars." The motion stated that these reports, conclusions, etc., were necessary for a full examination of Studer at his deposition. An order was entered on August 12 ordering GM to produce all reports, conclusions, tests, etc., that Studer would rely on at his deposition. Any reports, conclusions and results that Studer would not rely on at his deposition were to be produced by August 21.

Studer's deposition was taken on August 14. He stated that the reason the belt broke in the webbing was because the webbing had contacted some other hard object. He further stated that he had not made calculations and/or reached conclusions as to the position of the right front seat or the extent of any deformation of the "outboard side-bar" of the driver's and passenger's seats or the forces operating on the passengers within the car.

On August 30 GM moved to strike plaintiff's motion of August 1 for a "Bill of Particulars" stating that a bill of particulars was an inappropriate motion under the circumstances and also that the questions sought information which was "privileged" from discovery.

On September 12 plaintiff again moved for a protective order under Supreme Court Rule 219(c) (iii) and (iv) (Ill. Rev. Stat. 1967, ch. 110A, par. 219(c) (iii) (iv)), limiting GM's experts at trial, in relevant part, to those already disclosed to plaintiff; plaintiff further asked the court to prohibit these experts (in reality Studer) from giving an opinion as to matters Studer did not answer in the August 14th deposition; plaintiff finally asked that GM be prohibited from introducing any testimony as to data or results of any tests other than those conducted on January 9, 1967, and July 19 and 22, 1968, which tests (copies thereof) had already been furnished to plaintiff. In support of the motion plaintiff's counsel submitted an affidavit noting Studer's inability to comment as to certain

areas in the August 14 deposition and that another GM employee, Charles Potter, had refused to disclose certain tests on advice of counsel at a deposition taken September 6.

On September 12, after a hearing the previous day, an order was entered changing plaintiff's motion for a bill of particulars (of August 1) to interrogatories. Also plaintiff's request for GM's "theories, opinions, conclusions, or estimates" pertaining to the specified areas was changed to "facts" pertaining thereto. GM's answer did not have to disclose any "mental impressions, litigation plans or theories" of its attorneys.

A lengthy hearing was held on September 12 on plaintiff's motion for a protective order. The motion judge empathized with plaintiff's inability to obtain information which GM would use at the trial. He stated:

> "But the point is, [plaintiff's counsel] * * * is doing the best possible job for his client, and he assumes that what is happening here is that he * * * is not being given an opportunity to learn what the expert [Studer] found, and he does not want to hear it for the first time on the trial on the defendant's part of the case. He wants to be able to know in advance so that he can consult with his experts and learn the significance of his findings before it is sprung on him * * *."

The motion judge suggested that Studer be deposed again as to the four areas he was unable to answer at the August 14th deposition. Since Charles Potter conducted tests after July 22, 1968, under the direction of Richard Studer, Studer was to be questioned as to tests conducted after July 22; defendant protested that this would disclose his litigation theory. The motion judge stated that Studer could not be asked "why" he ran the tests, but that facts, results and opinions pertaining thereto would have to be disclosed. Counsel for GM agreed that Studer be deposed as to the tests Potter had run. To avoid a protective order GM agreed to submit Potter and Studer for further depositions. An order was entered denying plaintiff's motion for a protective order contingent upon GM producing Studer for a further deposition on September 13. As to the deposition of Studer, the questions were to be limited to the four areas he was unable to answer at his August 14 deposition and the tests run by Charles Potter after July 22. Questioning as to the tests was to be limited to the factual findings and opinions derived therefrom. Plaintiff was not to ask "why" the tests were run or their "significance" if such would reveal defense counsel's theories, mental impressions or litigation plans.

At Studer's deposition (on September 13) he stated that three or four seat belt "pull tests" had been run since August 14. He was then asked if further tests were scheduled. He replied, "No." He later added that although there were none scheduled, there might be additional tests; he

"presumed" there might be further tests; the tests would be like those already run. He stated that there was in excess of 45 "G" forces on the driver; perhaps half this force was on the passenger. Studer was asked if Potter's tests indicated the position of the left half of the belt in relation to the side-bar and mud sill. Studer answered, "Behind the seat back side bar" or "over the sill"; another description given was, "in a direction leading outward of the vehicle through the door opening, or leading between the seat back side bar and the seat, and then in an outboard direction towards the door opening."

On September 16 GM's attorney moved for a continuance before the trial judge until September 30. The motion stated that he had requested a continuance from the motion judge on September 11 but the judge said he had no authority to grant one. An affidavit was attached to the motion in which it was stated that discovery proceedings and judicial hearings had disabled defense counsel from properly marshalling the evidence and otherwise preparing for trial. He also stated that he had not fully collected information as to the "Bill of Particulars" served August 1, but amended to read "Interrogatories" and amended in substance, on September 11. The motion was denied.

The first trial (selection of the jury) began on September 17. The court stated that the trial proper would commence on September 24. On September 18 the trial judge declared that discovery would be closed but that areas in which discovery had already been sought could be updated.

On September 23, before the trial judge, defendant moved to vacate the order of September 12 changing plaintiff's "Bill of Particulars" to "Interrogatories." The motion was denied but defendant was given until September 24 to answer. Defendant complied on September 24.

The answers stated, in part, that the webbing of the belt broke when it was over the "center pillar cover" (windlace) under a loop load in excess of 5000 pounds which was the minimum standard of the Society of Automotive Engineers. As to "G" forces, it stated that those on the passenger were "substantially less" than those on the driver; that those on the driver were in excess of 42 "G's" with components of downward, forward and leftward forces.

A mistrial occurred on October 7. The cause was reset and a new trial commenced on October 14.

On November 1 plaintiff moved for GM to produce all tests run from September 12 to the present "wherein said seats were subjected to lateral forces to determine the lateral stability of the said seats." These tests, numbers 7 and 13, were produced on November 8.

On November 8 a hearing was held outside the presence of the jury.

Plaintiff objected to GM's non-disclosure of additional tests run after the first trial had begun. Defense counsel responded that he had not desired to go to trial at this early date and had in fact moved for a continuance; that part of the reason for the request for continuance was because he hadn't run all his tests; that tests had to be rerun because there were changes in the condition of plaintiff's car since July 1967 when defendant's experts first saw the car; that defendant first learned of this in July 1968. Also on November 8 plaintiff served a motion on GM for the production of other tests GM had run after September 17.

On November 12, in the morning session of the trial (four of GM's witnesses had already testified) GM introduced into evidence five of its tests. In the afternoon, at a hearing outside the presence of the jury, plaintiff moved that they be stricken and that GM be prevented from introducing any tests begun after trial. The court ordered four tests stricken but denied that part of plaintiff's motion which would prohibit GM from introducing tests run after the trial began. Plaintiff also made a further request for the production of other tests pursuant to its motion served on GM on November 8. Counsel for GM admitted that these undisclosed tests would be offered into evidence. He further stated that these tests were not disclosed earlier because they were "work product." Plaintiff stated that non-disclosure would mean that plaintiff would see the tests for the first time when Studer testified; that this would be too late for them to be studied effectively. The court required defendant to produce the tests. Further tests were introduced on November 12. As of November 13 plaintiff had not been furnished with photographs relating to certain significant tests. The remaining tests were admitted on November 13. Cross-examination of Studer took place on November 13 and 14. The testimony ended on November 15.

OPINION

We have described in detail the persistent efforts of plaintiff to obtain discovery. She feared surprise at trial and sought with extreme diligence to prevent it. Yet at trial GM was allowed to introduce into evidence tests and expert testimony based on those tests which for the most part were not commenced until after the first trial had begun on September 17, 1968. Many of these tests went right to the heart of the case, i.e., whether or not plaintiff's "pinch theory" was credible.

The motion judge had consistently held that plaintiff was entitled to discovery of any tests or any expert testimony that GM intended to introduce into evidence. He made this position known at the pre-trial hearing of July 22. This ruling was in accord with his belief that facts and opinions to which an expert will testify at trial are not work product under Supreme Court Rule 201(b) (2) (Ill. Rev. Stat. 1967, ch. 110A,

par. 201(b) (2)), and therefore are subject to discovery.[2] He best expressed his views regarding plaintiff's position at the pre-trial hearing of September 12 when he noted that her counsel was doing his best possible to protect her interests and did not want to learn what GM's expert (Studer) found for the first time at trial when GM presented its case. The judge stated that "he [plaintiff's counsel] wants to be able to know in advance so that he consult with his experts and learn the significance of his [Studer's] findings before it is sprung on him * * *."

On September 18 the trial judge closed discovery although he ordered that areas in which discovery had already been sought could be updated.

We recognize that GM moved for continuances on September 11 (before a motion judge) and September 16 (before the trial judge) alleging (in the latter instance) that, "[Defense counsel] has not yet talked to many of the witnesses he intends to use at the trial nor completed the necessary legal research nor selected nor collected exhibits nor completed the marshalling of the evidence which he intends to use in the defense of GM." There was no specific indication that additional time was needed for testing purposes. In its brief in this court GM places large emphasis on the fact that changed conditions in plaintiff's car, first learned of in July 1968, necessitated rerunning of tests. These "changed conditions" were not mentioned in the motion for continuance. The record fails to indicate that GM ran tests relevant to plaintiff's pinch theory of causation or GM's own theory of causation prior to July 1968. Furthermore, the "changed conditions" complained of were unrelated to the area of the car which was significant for purposes of running tests to rebut plaintiff's pinch theory or proving GM's theory. Defense counsel in effect admitted this himself at trial. While arguing an evidentiary point he stated:

> "There is no evidence that there is a single change in that car in the area that is involved here which is the seats, the sill plate, and the center pillar and the anchor points. There is not one shred of evidence here that the car is any different now from what it was [after the accident] * * *. Absolutely none."

In any event the car was reexamined by GM on August 6, 1968, but the significant tests were not commenced until more than one month later.

We point out with candor that the cases cited by plaintiff (*Battershell v. Bowman Dairy Co.*, 37 Ill.App.2d 193, 185 N.E.2d 340; *Greenberg v. Karris*, 80 Ill.App.2d 270, 225 N.E.2d 490), are those in which the violations of the discovery rules were more obvious, i.e., a party failed to re-

---

[2] GM has not questioned the work product ruling.

veal the name of a potential witness in response to a pre-trial interrogatory or deposition and thereafter sought to have the witness testify at trial. See *Foss Park District v. First National Bank of Waukegan*, 125 Ill.App.2d 276, 260 N.E.2d 474.

In the instant case the violation was less patent. In a very technical sense, that is, by merely looking at the orders entered by the court and GM's responses thereto, one might say that GM's compliance with the rules was adequate. However, a close review of the transcripts of the extensive pre-trial hearings, defense counsel's failure to specifically inform the trial court of the need to conduct further tests in its motion for continuance, defendant's argument concerning the changed condition of the rocker panel of plaintiff's car based on information obtained by it more than three years after the accident and the additional facts that pre-trial disclosure of GM's tests was so necessary for adequate trial preparation by plaintiff and that plaintiff sought diligently to obtain this disclosure can lead us to no other conclusion but that GM failed to comply with the requirement of "full disclosure" contained in the discovery rules. See Ill. Rev. Stat. 1969, ch. 110A, par. 201(b)(1).

In *Terry v. Fisher*, 12 Ill.2d 231, 239, 240, 145 N.E.2d 588, the court noted that the purpose of the discovery rules was to enable attorneys to better prepare and evaluate their cases. In *Monier v. Chamberlain*, 35 Ill.2d 351, 361, 221 N.E.2d 410, the court stated that "ascertainment of truth and ultimate disposition of the lawsuit" is better served when parties are well educated as to their respective claims in advance of trial. In *Drehle v. Fleming*, 129 Ill.App.2d 166, 171, 263 N.E.2d 348, aff'd 49 Ill.2d 293, 274 N.E.2d 53, it was stated:

"[T]he principle is now well established that the purposes of litigation are best served when each party knows as much about the controversy as is reasonably practicable. It is the purpose of pre-trial discovery procedures to enhance the truth seeking process, and good faith compliance with such procedures is both desirable and necessary."

These cases are cited not for purposes of factual analogy but rather the general principles they set forth, ones which we feel apply well to this case.

It is the general rule that the appropriateness of imposing sanctions against a party for non-compliance with the discovery rules (if a sanction is to be imposed at all) is within the discretion of the trial judge. (*Buckler v. Sinclair Refining Co.*, 68 Ill.App.2d 283, 290, 216 N.E.2d 14.) Factors to be considered are the surprise of the testimony to the opposing party (plaintiff here), the prejudicial effect of the testimony, the diligence of the opposing party in seeking discovery, timely objection

to the testimony and good faith of the party calling the witness (GM here). See *Rosales v. Marequez,* 55 Ill.App.2d 203, 207, 204 N.E.2d 829; *Buckler v. Sinclair Refining Co., supra,* at 290.

While under the circumstances shown by this record we do not question the good faith of GM's counsel, we believe all of the other factors above weigh in plaintiff's favor here. GM argues that plaintiff could not possibly claim "surprise" as to GM's theory of causation after GM had answered her interrogatories on September 24. However, the answer revealed, in relevant part, only that GM had conducted tests in September which showed that the belt broke when pulled over the center pillar cover (or windlace) at a pressure of over 5000 pounds. While this in fact was GM's theory of causation, none of the details of the testing procedures supporting the theory was set forth. No mention was made of the lengthy series of tests which were meant to show the implausibility of plaintiff's pinch theory.

■■ Plaintiff made full disclosure and diligently sought to obtain full disclosure from GM. The late tests of GM involved complex engineering principles. GM argues that plaintiff should have moved for a continuance under Supreme Court Rule 231 (Ill. Rev. Stat. 1969, ch. 110A, par. 231), if it was surprised at the introduction of the tests and the related testimony of Studer, or obtained evidence after trial to counteract the tests and then sought post-trial relief. (See *Henderson v. Shives,* 10 Ill. App.2d 475, 135 N.E.2d 186.) However, a motion for a continuance by plaintiff after the jury trial had been in progress for almost a month was not practical. Neither should the onus of showing that these tests could be counteracted by newly discovered evidence be placed on this plaintiff. The real issue is whether the conduct of GM in light of all the dogged persistence of plaintiff met its responsibility of full disclosure. We conclude that did not and that the court abused its discretion in admitting those tests not disclosed before trial and the testimony based on them. (Ill. Rev. Stat. 1967, ch. 110A, par. 219(c)(iv).) The judgment in favor of GM must be reversed and the cause remanded for a new trial. In view of this determination we need not consider plaintiff's other contentions as they relate to GM.

The remaining point for disposition is the propriety of the court's direction of a verdict in favor of defendant Irving at the close of all the evidence. The related facts follow.

Irving moved for a directed verdict at the close of the evidence. During argument on the motion, counsel for Irving argued that the evidence showed Irving had omitted the plastic boot (which plaintiff alleged should have been on the belt) because GM omitted it from its specifica-

tions for the model year 1965; that the boot had been supplied in previous years when GM's specifications did call for it. Then the following colloquy took place among counsel for plaintiff and Irving, and the court:

"Mr. Bonotto [for Irving]: I think * * * Irving * * * is entitled to a directed verdict at the close of the proof, * * *.

Mr. Davidson [for plaintiff]: I agree to stipulate and agree to it at the close of all the evidence because we have no rebuttal with respect to Irving.

The Court: At the close of all the evidence.

Mr. Davidson: Can I get this thing about our position on this, Judge, because I thought that with GM's case there would be more evidence coming in against Irving. None has — — There hasn't been any more evidence coming in against Irving.

The Court: I don't see any here, Mr. Davidson. All the tests indicate it exceeded all the standards. Your evidence was that there was a pinching.

Mr. Davidson: That's right * * * I am kind of reluctant to oppose it because I — — — .

The Court: So I can't see any evidence that the belt didn't meet proper standards. There was no failure of the belt when it pulled over and it still exceeded the standards.

Mr. Davidson: I think we find ourselves in that position.

The Court: So I am going to have to grant the motion * * *."

Later, when argument was held on GM's motion for a directed verdict, the following colloquy took place:

"Mr. Tozer [for GM]: I don't understand how Irving * * * could be let out if manner of construction and materials used is in. After all, they constructed the belt.

The Court: According to your design, though.

Mr. Tozer: But they did construct it.

Mr. Davidson: They didn't put it between those * * * two pieces of metal and we couldn't prove Irving knew this."

■■ Irving contends that the above constituted a stipulation on the part of plaintiff to a directed verdict in Irving's favor. We agree. As stated in *In re Estate of Moss,* 109 Ill.App.2d 185, 192, 248 N.E.2d 513:

"The reviewing courts of this state have consistently held that stipulations by parties or their attorneys affecting the conduct of suits will be enforced, unless there is a proper showing that any stipulation is unreasonable, violative of public morals or the result of fraud. [Citations omitted.] * * *. Stipulations are looked

upon with favor by the courts, since they tend to promote disposition of cases, simplification of issues and the saving of expense to litigants."

■■■ It is also true that stipulations must be clear, certain and definite. *In re Estate of Moss, supra,* at 194. We believe the above statement of plaintiff's counsel fulfills the mentioned requirement. We repeat the statement set forth above:

"I agree to stipulate and agree to it [obviously referring to Irving's motion for a directed verdict] at the close of all the evidence because we have no rebuttal with respect to Irving."

In an effort to demonstrate that the above was not a stipulation for a directed verdict, plaintiff notes that she vigorously opposed a similar motion by Irving at the close of plaintiff's case, the inference being that if such vigorous opposition to the motion was presented at the close of plaintiff's case, how could plaintiff suddenly agree to such a motion at the close of all the evidence? The answer is supplied by plaintiff's counsel himself during the above colloquy. He stated:

"Can I get to this thing about our position on this, Judge, because I thought that with GM's case there would be more evidence coming in against Irving. None has * * *."

As stated in *In re Estate of Moss, supra,* at 194:

"The stipulation was voluntary, valid, binding and enforceable. There must be a point of no return—a moment of finality—in all litigation. This case is no exception."

■■ Furthermore, regardless of the stipulation, we agree with the trial court that on the evidence in this case Irving was entitled to a directed verdict.

In conclusion, the verdict in favor of General Motors is reversed and as to this defendant the cause is remanded for a new trial at which both parties will have available to them all tests and expert testimony deemed desirable. The judgment entered pursuant to defendant Irving's motion for a directed verdict is affirmed.

Reversed in part; affirmed in part.

LORENZ, P. J., and ENGLISH, J., concur.