HARRIS TRUST AND SAVINGS BANK, Guardian of the Estate of John B. Hopp, Jr., a Minor, Plaintiff-Appellee, *v.* MASROOR ALI, M. D., *et al.*, Defendants-Appellants.—(MELVIN FEINBERG, M. D., Defendant.)— MASROOR ALI, M. D. *et al.*, Plaintiffs-Appellants, *v.* MELVIN FEINBERG, M. D., Defendant-Appellee.

First District (4th Division)    Nos. 80-2129, 80-2130 cons.

Opinion filed September 3, 1981.

Lord, Bissell & Brook and Baker & McKenzie, both of Chicago (Harold L. Jacobson, Hugh C. Griffin, Harry J. O'Kane, and Francis D. Morrissey, of counsel), for appellants.

Eugene J. Pavalon and Robert J. Cooney, both of Chicago (John W. Fisk and James T. Newman, of counsel), for appellee Harris Trust and Savings Bank.

Dore & Clark, Ltd., and Ronald A. Parizek & Associates, Ltd., both of Chicago (Cornelius F. Dore, William G. Clark, Jr., and Ilene M. Davidson, of counsel), for appellee Melvin Feinberg, M.D.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

The plaintiff as guardian of John Hopp, Jr., recovered $1,500,000 from defendants Drs. Ali and Feinberg and Sherman Hospital, Ali's employer, when the child was misdiagnosed and improperly treated for spinal meningitis. Sherman was sued solely as Ali's employer. Ali and Sherman Hospital appeal this verdict contending that:

1. a so-called loan receipt agreement between plaintiff and Feinberg, which provided that if plaintiff recovered from any other party Feinberg would be reimbursed for the $750,000 he paid under the receipt but which in no way released Feinberg from liability, should have been disclosed to the jury;

2. the trial court erred in not dismissing, until after the close of the evidence, a counterclaim by Feinberg against Ali and Sherman for total indemnity brought on the theory of active/passive negligence;

3. the trial court erred in refusing to allow Ali to introduce testimony from experts, whose names had not been given to the plaintiff prior to trial, to refute testimony of plaintiff's expert as to when irreversible injury occurred;

4. the plaintiff's questioning of Mrs. Hopp, the child's mother, as to whether she had made prior inconsistent statements in a deposition was reversible error;

5. plaintiff's rebuttal closing argument exceeded the bounds of proper advocacy.

Ali and Sherman do not contend that the verdict is against the weight of the evidence or unsupported by the evidence or that the damages are excessive.

We find no reversible error in the trial of Harris Trust v. Ali and Sherman and affirm that award.

Ali and Sherman had filed a counterclaim against Feinberg for indemnity and pro rata contribution. The trial court directed a verdict for Feinberg against Ali and Sherman at the close of the evidence on this counterclaim. We agree with the trial court that Ali and Sherman cannot recover under "An Act in relation to contribution among joint tortfeasors" (Ill. Rev. Stat. 1979, ch. 70, par. 301 *et seq.*). However we hold that the counterclaim did state a cause of action for pro rata indemnification and that the evidence, both that introduced into evidence and that of the excluded experts, was such that we cannot say "no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513.) Furthermore, we hold that while as to plaintiff's suit there was no reversible error in excluding the testimony of the three unlisted experts, it was error to exclude the testimony of two of them in support of the counterclaim. Accordingly, we reverse and remand for a new trial.

Despite the many witnesses at the trial, most of the facts leading up to the injury and lawsuit are uncontradicted.

John Hopp, Jr., was born on May 13, 1972. He was a healthy baby at birth and developed normally during the next six months. He first became ill on November 19, 1972, the Sunday before Thanksgiving. He vomited and had an 102° temperature, for which his mother gave him liquid aspirin. Since the infant did not improve, Mrs. Hopp took him to Feinberg, their pediatrician, Tuesday afternoon, November 21, 1972. Feinberg examined the child, diagnosed bronchitis, and prescribed Polycillin to be taken orally four times a day. Mrs. Hopp followed instructions but the child did not get any better. In fact the next day his temperature rose to about 105°. He was staring—that is, he could not follow movements of people or things. He was like a wet dishrag. He had no control, no movement of his extremities. The parents tried to reach Feinberg three times by telephone—unsuccessfully. They left a message for him but he did not return their telephone calls. Finally, late in the afternoon on Wednesday, November 22, the parents took the child to the emergency room at Sherman Hospital. They arrived at 4:50 p.m.

Mrs. Hopp told the nurse that the child was running a high fever, was vomiting, was staring and was doing nothing. The nurse noted on the emergency room record that the child was staring and was nonreactive. She took the baby's temperature rectally and recorded it at 105°. The infant was given one grain of aspirin and the nurse then brought towels

and ice cold water to sponge the child down. The Hopps sponged the child for about an hour or more, after which the child's temperature was down to 100-102°.

After the child's temperature had fallen, he was examined by defendant Ali. Both the Hopps testified that he was in the room for about two minutes and examined the child for less than a minute. He only used a stethoscope. He did not X-ray the child or take any blood from him.

Ali claimed that he gave the child a complete physical examination and performed the basic neurological tests. The child, although tired, was reactive; he was able to move his head, arms and legs in a normal manner and his eyes were normal. However Ali admitted on cross-examination that when he examined the child, the child remained silent, did not clench his fists, and was quiet. He was "washed-out."

Ali only found an upper respiratory infection and pharyngitis. He advised the Hopps to continue with the medication prescribed by Feinberg. He also claimed that he called Feinberg and advised him of his findings and diagnosis. Feinberg denied this and claimed that he did not know of the emergency room visit when he saw the child again on November 27, 1972. His secretary testified that the Hopps told her of the visit but she did not recall seeing a copy of the emergency room record for November 22, although the usual practice is to deliver the physician's copy of the record to the physician by putting it in his box at the hospital.

The Hopps left at 6:15 p.m. with their child; he was not hospitalized for observation. Before leaving, they were given a printed slip of paper stating that if the patient's condition persisted or got worse, they should contact his physician or return to the emergency room.

The emergency room record as it read immediately before suit was filed solely indicated that the diagnosis was "U.R.I. pharyngitis." The sole treatment listed was "aspirin grain 1," "continue medication as prescribed by Dr. Feinberg yesterday" and "cold sponge." Ali did not record the vital signs of the child, or put down that any physical or neurological exam of the child was conducted. After the complaint was filed, the emergency room record was again subpoenaed and copied. It had been altered by Dr. Ali to add a detailed examination of the infant which examination was negative. He also added "Dr. Feinberg notified" "to see Dr. Feinberg in the morning." At trial Ali admitted altering the record but could not recall when he did it.

The day after the emergency room visit, Thanksgiving, the child was slightly improved. He was able to move his head and neck slightly but his extremities were still limp. Mr. Hopp called Feinberg who told him to continue the Polycillin and bring the child in to his office on Monday, November 27.

Over the weekend, the child became worse. His temperature per-

sisted, he became limp and listless; he began to emit a screech or hurt cry, and his eyes appeared to be crossed. When Mrs. Hopp saw Feinberg on Monday she advised him of all this. Although these are classic signs of meningeal infection, Feinberg again diagnosed bronchitis and changed the prescription from Polycillin to Declomycin, an antibiotic known to be ineffective against meningitis. Feinberg told the parents to take the child home and made no appointment for any follow-up observation.

On December 2, 1972, as the child's condition had still not improved, Mr. Hopp took him to Feinberg's office and insisted he be admitted to the hospital for testing. Feinberg was reluctant to do so but finally agreed. A spinal tap was traumatic and showed blood in the spinal fluid. The child was immediately admitted to the hospital, placed in an oxygen tent and given intramuscular, not intravenous, shots of Polycillin. Although on December 2, 1972, the child was showing even more classic meningitis symptoms and other hospital tests on that date showed abnormal sugar, protein, and blood cell counts, all commonly associated with meningitis, it was not until December 4, 1972, that Feinberg made his first definitive diagnosis of spinal meningitis and changed the prescription to intravenous Polycillin. The disease thereafter ran its course, and the child was discharged from the hospital on December 31, 1972. He had suffered serious injuries from the disease including extreme brain damage and quadriplegia. The child, because of his condition, has had to be placed in a home.

At trial, plaintiff produced expert witnesses who testified that Ali should have performed a spinal tap on the child, that the tap would have revealed spinal meningitis and that had proper medication been given on that day, the child would have recovered without adverse effect. Conversely, Ali produced an expert who testified that Ali exercised the proper degree of emergency room care. However that witness admitted that Ali should have done a lumbar puncture if he noticed that the child was limp and "washed-out" or if the child did not clench his fists, move his arms and was silent. That witness further agreed that if after sponging, the extremities were still limp and the child was only able to move his head and neck slightly, it could not be considered a significant improvement and the child should have been kept for further diagnostic tests. Finally, the witness agreed that the altered chart showed the examination which should have been made.

Plaintiff also produced expert medical testimony from Dr. Mendelsohn to the effect that Feinberg violated the accepted standards of medical care by:

1. failing to see the child and perform a spinal tap on November 23, 1972, after being advised that the fever still persisted and the child was not responding to medication;

2. ignoring the compelling signs of meningeal infection on November 27, 1972, and failing to do a spinal tap on that date;

3. changing the medication on November 27, 1972, from Polycillin, a meningitis combatant, to Declomycin, a drug known to have no effect on meningitis bacteria, even though the child had numerous meningitis symptoms on that date. This change meant that from November 27 until December 2, five days, the child was receiving absolutely no medication for spinal meningitis;

4. failing to make a definitive diagnosis of spinal meningitis on December 2, 1972, despite the many symptoms, and administering intramuscular shots instead of intravenous antibiotics although the latter are much more effective;

5. failing to change the prescription from Polycillin when it was likely that resistance to that antibiotic had developed in the child's system.

Mendelsohn testified that if Feinberg had properly treated the child on November 24, 1972, the child would have had an overwhelming chance of complete recovery. By the 27th, he still would have had a good chance of recovery if properly treated but his chances were beginning to fade. He would have had an 80-90 percent chance of recovery without residual damage. By November 29, the child would have had only a 50-60 percent chance of complete recovery, especially since Feinberg had discontinued one of the antibiotics which constituted the best treatment. Mendelsohn further testified that irreversible brain damage had occurred by December 2, 1972, and that even if proper treatment had been instituted on that date, the course of the illness would not have been significantly changed. This conclusion was based on certain laboratory tests taken on that day which showed a major drop in the blood sugar. He believed that this drop occurred after the drug Declomycin was substituted for Polycillin.

Feinberg produced expert witnesses who testified that his conduct was reasonable.

I

Shortly before trial, plaintiff and Feinberg signed a written loan agreement, which stated:

"Loan Agreement
Docket No:    76 L 11705

Harris Trust and Savings Bank, as guardian of the Estate of John B. Hopp, Jr., plaintiff, hereby acknowledges receipt from United States Fire Insurance Company, paid on behalf of Dr. Mel Feinberg, one of the defendants, of the sum of SEVEN HUNDRED

FIFTY THOUSAND and No/100 DOLLARS ($750,000.00) as a loan, which said sum it promises to repay to the United States Fire Insurance Company, at the time of and in the event of recovery by it by means of judgment, compromise, settlement or in any other manner whatsoever, from any person, persons, corporation, corporations, or any other legal entities, causing or liable for loss or damage sustained by John B. Hopp, Jr., as a result of medical treatment administered to John B. Hopp, Jr., in 1972. This Agreement is in no way to be construed as evidence of wrongdoing or fault on the part of Dr. Mel Feinberg, and Dr. Feinberg makes no admission of fault."

The loan receipt agreement was fully revealed to the court, which over appellants' objections permitted Feinberg to remain a party defendant in the case. It also denied appellants' motion to declare the agreement void. Finally, it ruled that appellants could not disclose the existence of the agreement to the jury or use it to cross-examine Feinberg, the only witness who had knowledge of the agreement. (The child's parents, not being his guardian for purposes of the lawsuit, did not have knowledge of the agreement.)

Appellants on appeal no longer contend that the loan receipt was invalid so that issue is not before this court. They contend, relying on *Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, 412 N.E.2d 959, *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859, *Gatto v. Walgreen Drug Co.* (1975), 61 Ill. 2d 513, 337 N.E. 23, *cert. denied* (1976), 425 U.S. 936, 48 L. Ed. 2d 178, 96 S. Ct. 1669, *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 303 N.E.2d 377, *Schell v. Albrecht* (1978), 65 Ill. App. 3d 989, 383 N.E.2d 15, and *Hook v. Heim* (1977), 54 Ill. App. 3d 368, 370 N.E.2d 157, that the trial court's refusal to permit cross-examination on the loan agreement or to allow the agreement in evidence for any purpose was reversible error. The cited cases are not factually in point, since in all of them the loan receipt barred any additional recovery against the signing defendant or at least suit against that defendant was dismissed (except in *Schell* where the plaintiff could recover against the signing defendant if the other defendant was found not liable). However in the present case the loan receipt did not bar enforcement by plaintiff against Feinberg of any or all of the judgment and the claim against Feinberg was not dismissed. Nevertheless, certain general principles can be drawn from the cited cases:

1. a loan receipt agreement is tolerated if it is entered into before judgment because it encourages settlement but it is void if entered into after judgment since then its sole purpose is to enforce improper indemnification;

2. a loan receipt, even though entered into before trial, is void if not disclosed to the trial court, and a new trial will be granted;

3. a loan receipt can be used by the nonsigning defendant for the sole purpose of cross-examining any witnesses who know of the agreement as to bias.

■■ However, it is clearly established in *Casson v. Nash* (1978), 74 Ill. 2d 164, 384 N.E.2d 365, and *Kenny v. Lakewood Engineering & Manufacturing Co.* (1979), 85 Ill. App. 3d 790, 407 N.E.2d 551, that such agreement may not be used for impeachment where the bias of the witness is already evident and that its admission under such circumstances would be reversible error. In *Casson*, the trial court allowed the defendant to question the plaintiffs as to the existence of a loan agreement. The Illinois Supreme Court held this to be reversible error, pointing out at 74 Ill. 2d 164, 169, 384 N.E.2d 367:

> "The relevant principle that emerges from *Reese* is that when a witness whose interest in the outcome of the case is not apparent to the jury may be influenced by the existence of a loan-receipt agreement, the jury may properly consider the effect of the agreement on the credibility of that witness. The plaintiffs here certainly stood to gain by a recovery against Nash, but this is true in every case. A plaintiff always has an interest in his own recovery. Because the plaintiff's interest is already apparent (see McCormick, Evidence sec. 274, at 665(2d ed. 1972)), there is no need for the jury to be informed about the loan-receipt agreement."

In the present case the only witness who knew of the loan receipt was Feinberg—thus, he was the only witness whose bias could have been affected by its existence. Under *Reese*, normally the appellants would have been permitted "to establish that [the] witness knows of the existence of a loan agreement, and, if so, that the witness may be biased or prejudiced as a result thereof." (*Reese*, 55 Ill. 2d 356, 364, 303 N.E.2d 377, 387.) Clearly Feinberg was prejudiced against appellants since he could only recover the $750,000 if a judgment was awarded against them. But the jury was already fully aware of this prejudice since both doctors had counterclaimed, each against the other. As the supreme court pointed out in *Casson*, the bias of the plaintiff against the defendant is apparent; as to his counterclaim, Feinberg was the plaintiff suing Ali and Sherman, the defendants. Accordingly, following *Casson*, it would have been reversible error for the trial court to have permitted the use of the loan receipt in evidence.

We would further note that appellants' contentions in their brief that the case was a "sham" since Feinberg's liability to plaintiff was not conditioned on the verdict in his own case but on that in the case against

appellants; that plaintiff had a possible bias in favor of one defendant over another; and that Feinberg's counterclaim was a sham since because of the loan receipt he would not need indemnity are all groundless. Since, as we have already stated, the loan receipt did not bar recovery against Feinberg, the plaintiff could recover any verdict awarded against him although of course the $750,000 already paid would act as a set off; for the same reason the counterclaim was no sham. Finally since plaintiff could enforce any judgment against any party it had no reason to favor one defendant over another.

## II

■■ Appellants' second contention is that the trial court's refusal to strike Feinberg's counterclaim prior to trial was reversible error—the counterclaim was only dismissed after the close of the evidence. We need not determine if the counterclaim stated a cause of action since we find the appellants have not shown that they were prejudiced by the failure to strike the counterclaim and as this court has repeatedly stated, before a trial court can be reversed for an alleged error, prejudice must be shown. (*Millette v. Radosta* (1980), 84 Ill. App. 3d 5, 404 N.E.2d 823, *appeal denied* (1980), 81 Ill. 2d 593; *Herman v. Hamblet* (1980), 81 Ill. App. 3d 1050, 401 N.E.2d 973; *Gale v. Hoekstra* (1978), 59 Ill. App. 3d 400, 375 N.E.2d 456.) The appellants contend that the trial court's refusal permitted the introduction of improper evidence in that after completion of plaintiff's case Feinberg called Ali under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60), and examined him on the alteration of the hospital record, thus focusing attention on this issue. Appellants further contend that the refusal permitted Feinberg to attack Ali on every issue. We find these contentions to be without any merit.

■■ The admission of evidence as to Ali's altering of the record was not improper. It is textbook law that the fabrication of false documents is an admission by conduct in that the person fabricating the document gives grounds for believing that his case is weak. As stated in 2 Callaghan's Illinois Evidence §3.152 (1964), "When evidence is shown to have been fabricated, a presumption arises that the cause of action or the defense it was intended to support is without substantial foundation." Furthermore, the question by Feinberg on this issue was relevant to show the incredibility of Ali's testimony. He "could not recall" when he altered the document but he could remember exactly what he did on a single routine day several years before, including informing Feinberg of his examination and diagnosis.

Moreover the evidence was not admitted solely because of Feinberg's counterclaim. It was first mentioned by Ali's counsel in opening argument. It was developed when he was called by plaintiff under section 60.

Finally, the same examination was possible and proper under appellants' counterclaim, and the same is true as to the complained-of attacks by Feinberg against Ali.

### III

Appellants' third contention is that the trial court erred in preventing Ali from introducing expert testimony to rebut plaintiff's expert's (Mendelsohn) surprise change in testimony as to when permanent injury first occurred.

Because defendants had failed to name their expert witnesses, despite repeated interrogatories, the trial court on plaintiff's motion ordered defendants to identify all experts who would testify on their behalf on or before August 15, 1979. On September 5, 1979, Sherman and Ali identified Dr. Mennes as their expert. No attempt was made before trial began in January 1980 to designate additional expert witnesses.

After the end of the first week of trial, long before Mendelsohn testified, appellants indicated to the court they wished to produce an additional expert, Dr. Carruthers. No claim was made that Carruthers had just recently been discovered. The trial court ruled that Carruthers could not testify since she had not been listed in compliance with the court's order.

After the plaintiff had rested its case, Ali again tried to call Carruthers. He also attempted to call two additional unlisted expert witnesses, Drs. Levine and Segal. He stated that Carruthers and Levine would rebut a surprise change in Mendelsohn's testimony—however, the offer of proof, as the court noted, indicated that their testimony went far beyond the alleged area of change. Segal was offered merely to rebut the claim of one of plaintiff's experts, Dr. Baker, that he had practiced at Little Company of Mary Hospital in 1971 and 1972. Since the appellants only complain of the trial court's refusal to allow them to rebut Mendelsohn's testimony, any error in the court's exclusion of Segal is obviously waived. The trial court excluded all three witnesses since they had not been listed in compliance with the trial court's order and it would be unfair to plaintiff to allow these witnesses after it had rested its case.

We agree with the trial court that it had the right and duty to enforce its orders and prevent the calling of surprise witnesses to the prejudice of the plaintiff. (*Beasley v. Huffman Manufacturing Co.* (1981), 97 Ill. App. 3d 1, 422 N.E.2d 241; *Carlson v. General Motors Corp.* (1972), 9 Ill. App. 3d 606, 289 N.E.2d 439, *appeal denied* (1973), 53 Ill. 2d 605.) These were not witnesses whom Ali neither knew of nor could have known of before trial. Nor are we convinced that Mendelsohn's alleged change in testimony warranted the ignoring of the trial court's orders. In his deposition Mendelsohn testified that irreversible damage probably occurred around

December 6, 1972, but might have occurred at the time of the child's admission, December 2. He stated that it could not be determined if there was brain damage before December 6. He clearly stated he did not have any laboratory reports and had not used them in forming his conclusion. In fact the laboratory reports at that time were in the control of the defendants and as the trial court noted, he should have been asked if his opinion would have been different if he considered the laboratory reports. At trial Mendelsohn, relying on these same laboratory reports, testified that after November 27 the chances of complete recovery began to fade and that by December 2, the damage was irreversible and the course of the illness would not have been significantly changed had proper treatment been instituted at that time. Mendelsohn repeatedly stated that any change in his testimony was due to the fact that he had not had the laboratory reports at the time of his deposition. In light of the fact that Mendelsohn stated in his deposition that the damage could have become irreversible by December 2, 1972, we find no significant change in his testimony. Furthermore, a party cannot refrain from asking questions or producing relevant documents within his control at a deposition and then use his own failure in order to claim surprise.

■■ In any event, even if the exclusion of the witnesses had been error, the appellants still would not be entitled to a reversal of plaintiff's judgment against them, since the testimony was not relevant to the issues in plaintiff's case against appellants. Ali, and therefore Sherman, are liable for all damages caused to the child regardless of when the damage became irreversible. (*Alberstett v. Country Mutual Insurance Co.* (1979), 79 Ill. App. 3d 407, 398 N.E.2d 611.) Accordingly, the exclusion of the testimony could not have prejudiced appellants' defense of that case.

IV

Appellants' fourth complaint is that the trial court erred in permitting Mrs. Hopp to admit in direct examination that she had made an inconsistent statement at trial but that that statement was not true. Appellants contend that it was error to allow her to deny the truth of the statements before her cross-examination took place and that Supreme Court Rule 212, which controls the use of discovery depositions, does not permit such use.

Appellants overlook the fact that Supreme Court Rule 212 merely permits the use of depositions where they would otherwise be inadmissible. Plaintiff was not using the deposition. To the contrary, Mrs. Hopp was denying, not affirming, the truth of a statement made in the deposition.

■■ Appellants are not contending that the statement in the deposition was inadmissible. Rather, appellants are complaining because plaintiff

destroyed their trial tactics and prevented them from springing a surprise on Mrs. Hopp. A trial is still a search for the truth and not a game.

## V

■■ Finally appellants contend that certain remarks in plaintiff's rebuttal argument, constituted improper argument. A reading of the whole record, however, discloses that the complained-of remarks were a proper comment on the evidence and a proper response to the defendants' arguments. See *Oh Boy Grocers v. South East Food & Liquor, Inc.* (1979), 79 Ill. App. 3d 252, 398 N.E.2d 269; *Lawson v. Belt Ry. Co.* (1975), 34 Ill. App. 3d 7, 339 N.E.2d 381; *Saputo v. Fatla* (1975), 25 Ill. App. 3d 775, 324 N.E.2d 34, *appeal denied* (1975), 58 Ill. 2d 599.

## VI

As previously stated, Ali and Sherman have also appealed from the trial court's adverse ruling on their counterclaim against Feinberg. One count of the counterclaim sought pro rata recovery under "An Act in relation to contribution among joint tortfeasors" (Ill. Rev. Stat. 1979, ch. 70, par. 301 *et seq.*). Another sought common law pro rata indemnification for that portion of any judgment returned against Ali and Sherman attributable to Feinberg's subsequent malpractice. The first claim was dismissed by the court prior to trial; a directed verdict was entered at the close of the evidence on the other claim.

■■ We agree with the trial court that appellants cannot recover under the Act in relation to contribution among joint tortfeasors. That act is applicable only to causes of action arising on or after March 1, 1978. Appellants contend that the cause of action referred to is the cause of action for indemnity and that it did not arise until the judgment was awarded and paid. However, the statute is clearly merely a legislative adoption of the mandate laid down by the Illinois Supreme Court in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1978), 70 Ill. 2d 1, 17, 374 N.E.2d 437, 444, which provided that its ruling permitting contribution only applied to "causes of action arising out of occurrences on and after March 1, 1978." The occurrence in this case was the improper diagnosis and treatment in 1972. Accord, *Kenny v. Lakewood Engineering & Manufacturing Co.* (1979), 85 Ill. App. 3d 790, 407 N.E.2d 551.

However we agree with the appellants that under *Gertz v. Campbell* (1973), 55 Ill. 2d 84, 302 N.E.2d 40, and *Alberstett v. Country Mutual Insurance Co.* (1979), 79 Ill. App. 3d 407, 398 N.E.2d 611, appellants do have a cause of action for pro rata indemnification and that the evidence was sufficient to go to the jury.

In *Gertz*, a motorist, Campbell, struck Gertz with his automobile. When Gertz filed suit against Campbell, Campbell in turn filed suit

against Snyder, the doctor who had treated Gertz for the injuries received in the accident, alleging that Gertz's leg only had to be amputated because Snyder had delayed in performing needed surgery and that but for the neglect Gertz could have anticipated a normal recovery from a broken leg. Campbell in his third-party complaint claimed that he would be liable for the aggravation of Gertz's injury caused by Snyder's negligence and asked for judgment against Snyder for the amount of the damages caused by Snyder's malpractice. The Illinois Supreme Court held that the third-party complaint stated a cause of action, explaining at 55 Ill. 2d 84, 91-92, 302 N.E.2d 44, 45:

> "Campbell is to be liable for the aggravation of the injuries suffered by Gertz because of Dr. Snyder's negligence simply because it is the policy of the law to hold him legally responsible for the additional damages which are said to have been foreseeable. He did not act in concert with Dr. Snyder. There is nothing to suggest that he had anything to do with the selection of the physician and certainly he had no control over Snyder's conduct. There was nothing he could have done to have prevented the independent negligence of the physician. If Campbell, who is to be liable for the malpractice of Dr. Snyder, is precluded from seeking indemnity from Snyder, the result will be a really indefensible enrichment of Snyder at the expense of Campbell."

In *Alberstett*, a child who had suffered a severe knee laceration was taken to a health center where the wound was cleaned and sutured by Dr. Canfield. A day later, his mother called Dr. Bazuin at the health center, who suggested she loosen the bandages and give the child some aspirin. The next day the child was taken to Rockford Memorial Hospital where he was treated by Drs. Webb and Stohl. Still later he was transferred to another hospital where he died. The parents sued Canfield and Bazuin. They settled but sued Rockford, Webb and Stohl for equitable contribution, alleging the third-party defendants were negligent in attempting to treat the child knowing they did not have the proper facilities for effective treatment. The appellate court held that the third-party complaint stated a cause of action, stating at 79 Ill. App. 3d 407, 411-12, 398 N.E.2d 614:

> "The third-party defendants argue that *Gertz* is factually inapplicable, primarily because the third-party plaintiffs are not the original tortfeasors, as in *Gertz*, but are prior malpracticing doctors. But *Gertz* emphasized two things about the relationship between the tortfeasors in that case: (1) that the first tortfeasor be found liable at law for the negligence of the second party, and (2) that the first tortfeasor lacks effective control over the actions of the second party. These factors are fulfilled in this case as well.

It may be true, as appellees argue, that a doctor has the continuing duty to care for the patient. But that duty cannot be extended to make him liable for the negligence of doctors sought out for treatment by the plaintiffs independently. The Alberstetts took Scott to the hospital on their own initiative. They chose the hospital and the doctors that would care for the boy. Although it is probable that this was the best course of action, in so doing they ended the doctor-patient relationship with Doctors Bazuin and Canfield. Thus, Doctors Canfield and Bazuin no longer had the right to treat Scott Alberstett. Therefore, it is not fair to consider that they continue to owe a duty to care for him. More importantly for the *Gertz* analysis, Canfield and Bazuin cannot be said to have controlled the professional actions over the course of the treatment which the third-party defendants applied to Scott Alberstett.

On the other hand, Canfield and Bazuin have been charged for the damages caused by the negligence, if any, of the hospital and doctors (third-party defendants). As it is foreseeable that plaintiff will seek out medical aid to correct the injury done through the negligence of the original tortfeasor, so it is foreseeable that plaintiff will seek alternative medical aid to correct an injury aggravated by the negligent malpractice of the first doctors. Thus, because the law makes each person liable for the foreseeable results of his negligence, it is logical that both the original tortfeasor and the negligent doctors are liable at law for the negligent acts of subsequent malpracticing doctors. * * *

Thus we hold that where certain tortfeasors effect a good faith settlement with the plaintiff by means of a release intended to cover all injuries, these settling tortfeasors may maintain a third-party action to recover from subsequent allegedly malpracticing doctors the pro rata share of the damages caused by their acts."

As in *Gertz* and *Alberstett*, the serious injuries which finally did occur might not have occurred had Feinberg not been guilty of malpractice. Nevertheless, for the reasons stated in *Alberstett*, Ali was liable for all the damages, not merely those caused by his own misconduct. Likewise, as in *Gertz* and *Alberstett*, Ali had no control over Feinberg's actions, nor could he treat Feinberg's patient.

Feinberg contends that he and Ali were joint tortfeasors because the injury was indivisible and that the witnesses testified that they could not fix the time when the disease began or irreversible damage occurred. However there was ample evidence from which the jury could have concluded that no irreversible damage would have occurred had Dr. Feinberg properly treated the child on November 24, 27 or even December 2. Mendelsohn, plaintiff's expert witness, testified that had the

child been properly treated on November 24 the child would have had an overwhelming chance of complete recovery and that by November 27 he still had a good chance of recovery. After that, his chances were much less because of Feinberg's discontinuance of Polycillin which both he and Ali had prescribed and his prescription of an absolutely useless medication. Dr. Gotoff, one of Feinberg's expert witnesses, testified that the child suffered irreversible brain damage after December 4, 1972. Dr. Kieff, Feinberg's other expert witness, indicated that the brain damage became irreversible after December 6. Feinberg himself admitted that he did not believe there had been "brain involvement" on November 27; this meant of course that there was no brain damage on that date. He further testified that while there may have been some brain damage on December 2, it would not have been irreversible.

■■ From the evidence, the jury could have concluded that while Ali's treatment did not meet the proper standard, any injuries resulting from that negligence would have been minimal had Feinberg, who reassumed the role of the child's physician after November 22, not so grievously erred in diagnosing and treating the child. It could easily have concluded that all of the permanent injuries were due to Feinberg's continuing errors and not to Ali's single misjudgment. To saddle Ali with full responsibility toward the plaintiff for the damages reasonably satisfies the aim of tort law to provide full compensation to the victim. (*Alberstett v. Country Mutual Insurance Co.* (1979), 79 Ill. App. 3d 407, 398 N.E.2d 611.) But to saddle Ali with the full responsibility and allow Feinberg to escape scot-free despite the possible jury findings we have noted would be an indefensible enrichment of Feinberg at the expense of Ali. (*Gertz v. Campbell* (1973), 55 Ill. 2d 84, 302 N.E.2d 40.) The right of indemnity arises out of the principle that everyone is responsible for the consequences of his own wrongs, and if others have been compelled to pay damages which ought to have been paid by the wrongdoer, they may recover from him. *Gertz v. Campbell* (1973), 55 Ill. 2d 84, 302 N.E.2d 40.

■■ This court ruled earlier in this opinion that the trial court's refusal to allow appellants' unlisted expert witnesses to testify was not prejudicial error as far as the claim by plaintiff was concerned. However, it was error to refuse to allow Levine's and Carruther's testimony in support of the counterclaim. The order limiting witnesses was entered on behalf of the plaintiff, not on behalf of Feinberg. Indeed the counterclaim had not even been filed at the time that order was entered. The testimony of Levine and Carruthers would have related to when irreversible damage occurred, and thus was material. It should be permitted at the new trial.

For the foregoing reasons, the judgment for plaintiff against all of the defendants is affirmed. The judgment against Ali and Sherman on their counterclaim is reversed and the claim is remanded for a new trial.

Judgment for plaintiff against all defendants affirmed; judgment on counterclaim reversed and remanded for new trial.

JOHNSON and LINN, JJ., concur.