Hobert R. LeMaster, Plaintiff-Appellee, *v.* Chicago Rock Island & Pacific Railroad Company, Defendant-Appellant.

First District (3rd Division) No. 56463

Opinion filed February 10, 1976.

Alvin E. Domash, Richard E. Mueller, and Hugh C. Griffin, all of Lord, Bissell & Brook, of Chicago, for appellant.

John C. Mullen and Lee Leibik, both of Chicago, for appellee.

Mr. JUSTICE McGLOON delivered the modified opinion of the court on rehearing:

Plaintiff, Hobert LeMaster, brought an action under the provisions of the Federal Employers' Liability Act (45 U.S.C. § 51 *et seq.* (1970)) against his employer, the Chicago Rock Island & Pacific Railroad Company, for personal injuries he sustained in the course of his employment. After hearing the evidence in the case, a jury returned a verdict of $1,000,000 for plaintiff, and the circuit court entered judgment thereon. The trial court denied the defendant's post-trial motion, and this appeal follows.

On appeal, the defendant alleges the following errors: (1) The plaintiff's attorney engaged in prejudicial misconduct by improperly cross-examining defendant's claim agent, and by commenting improperly during closing argument; (2) The trial court erred in admitting prejudicial evidence of plaintiff's family circumstances; (3) The trial court erred in improperly restricting the cross-examination and impeachment of plaintiff's treating physician, and in excluding the doctor's entries in the hospital record from evidence; (4) The trial court erred in admitting three irrelevant contract provisions into evidence, and giving misleading instructions which prejudiced the jury; (5) The trial court improperly refused to allow the defendant to establish its defense by a full cross-examination of plaintiff and plaintiff's expert witness; (6) The plaintiff's use of evidence of his injuries constituted error; (7) The trial court erred in not following the Illinois *Allendorf* rule concerning the method of reducing future earnings to their present cash value; (8) The verdict of $1,000,000 was excessive; and (9) The cumulative effect of the trial court's errors and the prejudicial misconduct by plaintiff's attorney deprived the defendant of a fair trial.

We affirm.

The testimony at trial disclosed that in the early morning hours of June 12, 1969, the plaintiff was working as a switch foreman for the defendant Railroad in Davenport, Iowa. At that time, the plaintiff was supervising the movement of seven empty boxcars into a Ralston-Purina Company grain warehouse. As the boxcars approached the warehouse, plaintiff boarded the lead car and started climbing its ladder so he would be in position to properly set the car's handbrake. Plaintiff testified that while on the ladder he felt a sudden jolt which threw him to the tracks below, where he was run over by the lead wheels of the second boxcar, resulting in the amputation of his left leg 6 inches below the groin, his

left hand above the wrist, and portions of three toes from his right foot. He also sustained a broken collarbone and rib.

In his complaint filed pursuant to the provisions of the FELA, plaintiff alleged that the Railroad negligently failed to provide him with a reasonably safe place to work. At trial, the plaintiff introduced evidence to prove that the train yard he had worked in the night of the accident was slippery as a result of a combination of spilled grain, water from a recent rainfall and an oil base weed killer sprayed on the tracks earlier in the day which formed a slippery "jello-like" mush that was stuck to plaintiff's boots and gloves. Other evidence showed that the jolt plaintiff described in his testimony may have been caused by a minor derailment of the lead boxcar. Plaintiff's theory was that the derailment jolt combined with the slippery mush on his boots and gloves caused him to lose his hold on the train's ladder and fall to the tracks.

The Railroad's theory was that the plaintiff's fall was caused entirely by his own negligence, including the violation of certain railroad safety rules which specify the proper way to supervise a movement of boxcars.

At trial, the plaintiff proved actual damages amounting to over $180,000. After hearing all the evidence, the jury returned a verdict for plaintiff in the amount of $1,000,000.

The first allegation of error we consider concerns the plaintiff's cross-examination of Charles E. Hill, the defendant Railroad's employee who signed the defendant's answers to plaintiff's interrogatories. The defendant claims that Hill was improperly cross-examined and the subject of the cross-examination was raised improperly in plaintiff's closing argument so that the plaintiff was able to create the unfair impression that the Railroad had deliberately concealed evidence from the plaintiff during discovery, thus inflaming the emotions of the jurors against the defendant and depriving the defendant of a fair trial.

To understand the facts leading up to the cross-examination, we must describe the discovery process of the case. After the reciprocal *Monier* order was entered, plaintiff directed written interrogatories to defendant under the provisions of Illinois Supreme Court Rule 213. Four months later, on October 14, 1970, defendant filed its first answers to the interrogatories. We are concerned with interrogatories numbers 3, 4 and 21. Plaintiff's interrogatory No. 3 asked:

> "State the names and last known addresses, as known to the defendant's agents, employees or attorneys, of all persons who were occurrence witnesses to the incident mentioned in the Complaint when Hobert LeMaster was injured on June 12, 1969."

Defendant answered: "Unknown—investigation continues." Plaintiff's interrogatory No. 4 asked:

"State the full names and address of each person not named (in 3) above who was present or claims to have been present at the scene immediately before, at the time of or immediately after said occurrence."

In answer, defendant listed the name of the engineer who moved the cut of train cars which struck the plaintiff, and the names of three men who were in plaintiff's switching crew on the night of the accident. Plaintiff's interrogatory No. 21 asked:

"State whether or not the defendant railroad has a surveyor's diagram or plat in its possession covering the physical layout of the railroad tracks, streets and buildings, etc. in the general area where the plaintiff was injured on June 12, 1969, and if the answer is in the affirmative, state:

a) The date the survey or plat was made;

b) The person or persons who has possession of a copy of said plat."

The defendant stated that it did have such a plat, that the plat was dated April 15, 1959, and was in the possession of G. E. Johnson.

On November 5 and December 28, 1970, defendant filed amended answers to plaintiff's interrogatory No. 4, naming the Railroad's superintendent of safety, division safety officer, train master, and terminal superintendent as having been present at the scene either immediately before, at the time of, or immediately after the occurrence.

The original answers and all amended answers were signed for the Railroad by C. E. Hill, a claim agent employed by the defendant Railroad.

A few weeks prior to trial, on December 29, 1970, plaintiff's counsel sent a letter to defendant's counsel stating that on December 24, 1970, the Railroad had, for the first time, disclosed that it possessed certain plats and diagrams prepared a few hours after the accident by a then-unknown employee of the Railroad. Because the defendant's possession of these diagrams apparently contradicted the defendant's answer to interrogatory No. 21, plaintiff demanded immediate up-to-date answers to all prior interrogatories and immediate compliance with the *Monier* order. Plaintiff further demanded the production of any of defendant's personnel who were at the scene on the date of the injury.

On January 4, 1971, the defendant produced for deposition Mr. Edward Monahan, a previously undisclosed Railroad employee, who was at the scene a few hours after the accident to prepare diagrams of the site. The defendant also produced three diagrams of the track area made by its engineering department; two diagrams were dated June 12, 1969, and one was dated January 4, 1971.

On January 13, 1971, the third day of trial, defendant made certain

oral amendments to its answers to plaintiff's interrogatories. On January 19, 1971, plaintiff's counsel stated to the court that although defendant had presented to him certain weed spray records on December 24, 1970, plaintiff now found that these records were incomplete. These records represented the log of the Railroad's weed spray program of June 1969, in the West Davenport rail yards, where the injury occurred. Because of the plaintiff's allegation at trial that the oil based weed spray had contributed to cause his fall under the moving train, plaintiff's counsel brought the matter to the attention of the trial court when he discovered that the records he had been given omitted the log of weed spray operations for June 11 and 12, 1969, the day before and the day of the accident. Upon this representation the trial judge suggested that defendant's counsel make a search for the missing records. Defendant's counsel contended he had given plaintiff all of the weed spray records. Nevertheless, on the next day, January 20, 1971, defendant's counsel disclosed that he had found the weed spray records of June 11 and 12, 1969, and presented them to plaintiff.

On January 20, 1971, Charles Hill, a claim agent employed by the defendant who signed all of the defendant's written answers to the interrogatories, was called as an adverse witness by the plaintiff. The defendant immediately objected to Hill's testimony on the grounds of relevancy. Plaintiff's counsel argued that due to defendant's seeming reluctance to produce documents during the course of the discovery proceedings, he believed that there was further discoverable information which had not been disclosed by the Railroad. The trial judge overruled the objection and allowed Hill to be cross-examined as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 60).

Plaintiff's counsel questioned Hill about the answers to the interrogatories he had signed on behalf of the Railroad. During this questioning plaintiff's counsel read, in the presence of the jury, plaintiff's interrogatories No. 4 and No. 21, and the Railroad's original and amended answers to these interrogatories. Plaintiff's counsel also asked Hill whether the weed spray records were under his control; he responded that they were not. Counsel inquired whether Hill knew that certain of the weed spray records were not given to plaintiff until the 20th; Hill responded that he did not. Plaintiff further inquired whether Hill knew when the existence of Monahan was disclosed and certain diagrams prepared under his supervision were given to plaintiff; Hill said he did not.

After Hill's testimony defendant objected to the entire examination as being irrelevant and moved that the testimony be stricken and a mistrial

declared. During argument on the motion plaintiff reviewed the above mentioned sequence of discovery and stated that he believed that there were further weed spray records which had not been produced by defendant. (The plaintiff contended that his examination of witness Cruse, another employee of defendant, disclosed that there may have been records showing the composition of the sprayed weed killer, whether the chemical weed killer was mixed with water or oil, *i.e.*, the actual "tank car consist.") Plaintiff concluded that all of these facts cast great doubt upon the defendant's contention that it had produced all the documents it had been ordered to produce, and that this failure to produce was a relevant fact for consideration by the jury. In support of its motion, defendant cited to the court 34 Ill. L.&Pr. *Trial* § 85 (1958), which states in part that "counsel should never ask irrelevant questions merely for the purpose of embarrassing the witness or causing the jury to draw some unfavorable inference against the witness." (34 Ill. L.&Pr. *Trial* § 85, at 524-25 (1958).) The court ruled that the entire testimony of Charles Hill should be stricken, and then the proceedings went off the record. Upon resumption of the record, plaintiff made a comment concerning the matter and then the following exchange occurred:

"THE COURT: All right. If there is anything you want to have me rule on tomorrow morning, I can still change my ruling.

DEFENDANT'S COUNSEL: The damage has been done and in conjunction with that, we again renew our motion for a mistrial based on improper examination of Mr. Hill. All of the information he wanted, he got. It is as simple as that.

PLAINTIFF'S COUNSEL: Yeah?

DEFENDANT'S COUNSEL: Yeah.

PLAINTIFF'S COUNSEL: Here is a piece I didn't get, and it wasn't in the original Monier production, Exhibit No. 200. I never got that, a critical piece of evidence.

THE COURT: All right, I will reverse myself. I will leave his testimony in because he did talk about the weed program here. I notice from my notes he did. All right, strike Charles Hill's testimony before the jury, motion heard and denied.

DEFENDANT'S COUNSEL: Okay, I will scratch my note out.

THE COURT: Okay, that settles that."

Exhibit No. 200 is the log of weed spraying operations first produced by defendant on January 20, 1971, well into the trial.

During his closing argument plaintiff's attorney again raised the issue when he argued that defendant had not disclosed the existence of Monahan in accordance with the ordered discovery. The defendant's objection

was overruled and plaintiff continued, arguing that the reason the defendant never listed Monahan was "because Monahan had some goods that they didn't want revealed to the public eye."

On appeal defendant argues that it was error to allow the plaintiff's examination of Hill and the comments during closing argument, because through this evidence, innuendo and improper argument, plaintiff's counsel inflamed the jurors' emotions against the Railroad so that the Railroad was denied a fair trial. Defendant specifically complains that there was no basis for allowing plaintiff to read the interrogatories and answers during the examination of Hill, as answers to interrogatories may be used only for impeachment or as an admission of a party. We disagree and find that plaintiff's counsel's questioning of Hill and the subsequent argument to the jury were not improper when considered in the totality of events which occurred during the trial of this cause.

■■ To begin an analysis of this issue, it is clear that the authorities recognize that a party's failure to produce documents is conduct that can be evidence.

> "In the second class of cases is to be included that sort of conduct which is received only when it emanates from a *party to the cause* or a *witness,* and can therefore be equally justified as involving an *admission* or a *discrediting circumstance.* Such conduct, for example, as the fabrication or suppression of evidence, the failure to produce important witnesses or documents, indicates a consciousness that one's cause is a bad one or a weak one, and from this consciousness or belief may be inferred the fact that it is bad or weak, *i.e.,* that facts essential for its support are lacking * * *." (2 Wigmore, Evidence § 267, at 95 (3rd ed. 1940).)

Wigmore further states that this evidence, when confined to the conduct of parties in the cause, is receivable against them as an implied admission, and is receivable equally against civil parties and criminal defendants. 2 Wigmore, Evidence § 277 (3rd ed. 1940).

> "No useful purpose would here be served in undertaking to make further classification of the innumerable instances of conduct, both verbal and non-verbal, of a party indicating a consciousness of guilt. The common experience of mankind in dealing with the ordinary affairs of life should offer, it would seem, an indispensable test in making the determination as to whether or not the particular conduct encountered is calculated to raise the inference of a consciousness of guilt. And in this connection, common experience dictates that often times while an affirmative or a negative act of a party may not in and of itself justify such an

inference, considered in the light of the attendant facts and circumstances, an entirely different result is warranted." (2 Wigmore, Evidence § 278, at 53 (1975 Supp.).)

This is also the law enunciated in Illinois. Gard, Illinois Evidence Manual Rules 22, 23 (1963); *Tepper v. Campo* (1947), 398 Ill. 496, 505.

Defendant contends that it has not suppressed or concealed any evidence inasmuch as all the evidence plaintiff alleges was withheld was eventually given to plaintiff either immediately before or during the trial. A similar argument was considered and rejected by this court in *Carlson v. General Motors Corp.* (1972), 9 Ill.App.3d 606, 289 N.E.2d 439, wherein the defendant refused to disclose certain discoverable material to the plaintiff prior to trial and, as this material was favorable to the defense case, disclosed the material for the first time through the testimony of witnesses during the trial of the case. The court reviewed the purpose of the discovery rules:

> "In *Terry v. Fisher*, 12 Ill.2d 231, 239, 240, 145 N.E.2d 588, the court noted that the purpose of the discovery rules was to enable attorneys to better prepare and evaluate their cases. In *Monier v. Chamberlain*, 35 Ill.2d 351, 361, 221 N.E.2d 410, the court stated that 'ascertainment of truth and ultimate disposition of the lawsuit' is better served when parties are well educated as to their respective claims in advance of trial. In *Drehle v. Fleming*, 129 Ill.App.2d 166, 171, 263 N.E.2d 348, aff'd 49 Ill.2d 293, 274 N.E.2d 53, it was stated:
>
> > '[T]he principle is now well established that the purposes of litigation are best served when each party knows as much about the controversy as is reasonably practicable. It is the purpose of pre-trial discovery to enhance the truth seeking process, and good faith compliance with such procedures is both desirable and necessary.'
>
> These cases are cited not for the purposes of factual analogy but rather the general principles they set forth, ones which we feel apply well to this case." (9 Ill.App.3d 606, 619.)

The court concluded that although the defendant, General Motors, had technically complied with the rules of discovery, this type of compliance did not comply with the requirement of "full disclosure" contained in the discovery rules.

■■ A review of the facts in the instant case indicates that the defendant Railroad technically complied with the discovery rules, but did not meet its responsibility of full disclosure. In *Carlson*, such an inadequate disclosure warranted the levying of judicial sanctions against the non-

disclosing party. Herein, judicial sanctions were not sought; rather, plaintiff showed to the jury the extent of defendant's inadequate disclosure in the face of plaintiff's diligence in attempting to discover information known to the Railroad. Although an inadequate disclosure may not be as serious as a complete nondisclosure by a concealing party, there may be instances wherein a trial court may properly allow evidence of an inadequate disclosure to be presented to the jury. The admission of such evidence is within the discretion of the trial court. In the case at bar, considering the nature of the information concealed from discovery until the eve and the midst of trial, we do not feel that the trial court abused its discretion by permitting plaintiff to introduce evidence of the defendant's inadequate disclosure to the jury or to argue to the jury based upon this evidence.

Although we feel that there may have been better ways for the plaintiff herein to have presented his evidence of defendant's inadequate disclosure to the jury, the matter was within the sound discretion of the trial court, and we do not believe that discretion was abused.

The defendant argues that the reason for its late production of certain documents was the plaintiff's persistence in advancing this case for trial so as to shorten the customary pretrial discovery time for similar cases in this jurisdiction. We would more readily understand this contention of the defendant if the specific documents herein at issue were the normal products of pretrial investigation. We would point out that the items in issue, the existence of witness Monahan and his work in making two diagrams dated as of the date of the accident, and the weed spray records of June 11 and 12, were made or caused to be made by the defendant corporation almost simultaneously with the occurrence of the plaintiff's injury. We are not persuaded that the plaintiff's "rush to trial" could have seriously affected the production of evidence that was prepared by and, therefore, known to the defendant at the earliest stages of this controversy.

Closely related to the issue of evidence and argument concerning the suppression and concealment of evidence is the defendant's argument on appeal that plaintiff's counsel's improper comments during closing argument as to defendant's employee Cox prevented the defendant from receiving a fair trial. James Cox was the Railroad's claim agent who investigated plaintiff's fall from the railroad car at the scene by taking statements and photographs. Although plaintiff indicated in a notice to defendant under Supreme Court Rule 237(b) that Cox was to be called as a witness at trial, Cox was not called. Nor did defendant call Cox as a witness. During plaintiff's first closing argument, counsel argued that the Railroad did not call Cox because he would be subjected to cross-

examination as to the whereabouts of plaintiff's gloves, which had disappeared after the accident. Defendant responded to the comments on Cox by arguing that plaintiff should have called Cox, asking the question of "why didn't he call Mr. Cox?" Plaintiff responded to the question during final closing argument:

> "Cox, why didn't I put on Mr. Cox? You know why I didn't put on Mr. Cox? He's the claims man and in my judgment, he was not a witness that could be called under Section 60, so I'd be bound by his testimony, and I am not going to be bound by Mr. Cox' testimony. If they put him under oath ten times up there, I'm not going to be bound by it.
>
> DEFENDANT'S COUNSEL: Objection. I—objection.
>
> PLAINTIFF'S COUNSEL: You asked why. That's why I didn't bring in Mr. Cox, but they could have brought in Mr. Cox; couldn't they? And they could have had him tell us where's the gloves.
>
> DEFENDANT'S COUNSEL: Your Honor, I object as to what his judgment is on Section 60.
>
> THE COURT: Overruled. Argument."

On appeal, defendant concedes that plaintiff had the right to reply to defense counsel's argument to explain why plaintiff did not call Cox, but contends that it was reversible error for plaintiff's counsel to imply to defendant's prejudice that Cox would not have told the truth if called as a witness. Having read the argument complained of, we do not feel that such an inference as defendant proposes may be reasonably drawn from plaintiff's counsel's closing argument. The argument was not prejudicial to defendant's right to a fair trial.

The defendant's second allegation of error is that certain evidence admitted at trial as to the plaintiff's family circumstances was prejudicial and irrelevant. The record reveals that during opening argument plaintiff's counsel mentioned that plaintiff was married, had two children living at home, and two married daughters. Later, during direct examination, plaintiff testified that he used to go ice skating with his family, including his "little boy that is ten years old" and his "daughter that is seventeen years old." Also, plaintiff testified that he needed his wife's assistance to bathe. During closing argument, the plaintiff's inability to skate and dance were again commented upon, as was his suffering in the presence of his wife.

The trial court overruled defendant's various objections to such testimony and argument, ruling that some nondetailed evidence as to plaintiff's family would be permitted as it pertained to the area of damages. Defendant contends on appeal that the trial court erred.

██ The general rule is that in an action for personal injuries where family support or conjugal rights are not in issue, any mention of plaintiff's spouse and children is often so irrelevant and prejudicial as to constitute reversible error. Such testimony has a tendency to influence jurors and excite their prejudices and sympathies so that even curative instructions have been held to be ineffectual to remedy the damage done by the mere mention of plaintiff's family. *Jones & Adams Co. v. George* (1907), 227 Ill. 64, 81 N.E. 4; *McCarthy v. Spring Valley Coal Co.* (1908), 232 Ill. 473, 83 N.E. 957.

In certain instances, however, proof of plaintiff's family circumstances has been held to be relevant to the issues of a particular case, and may properly be admitted into evidence. (*Hedge v. Midwest Contractors Equipment Co.* (1964), 53 Ill.App.2d 365, 202 N.E.2d 869.) The extent of a plaintiff's disability is an element of damages, and evidence of a plaintiff's family has been allowed as it bears upon his diminished ability to enjoy his usual recreational activities. In *Hedrich v. Borden Co.* (1968), 100 Ill.App.2d 237, 241 N.E.2d 546, the plaintiff had sustained an injured foot and he testified at trial that before his accident he could go ice skating and sledding with his children, and square dancing with his wife. After the accident, he could do neither. The appellate court held that the incidental disclosure that plaintiff had children was not so prejudicial to defendant's cause to warrant a new trial, inasmuch as plaintiff's family status provided some insight as to an element of damages, there was no undue emphasis on the fact that plaintiff had a wife and family to support, and the object of the testimony was not solely to enhance damages or calculated to arouse the sympathy of the jury.

In *Lebrecht v. Bethlehem Steel Corp.* (2d Cir. 1968), 402 F.2d 585, 37 A.L.R. 3d 1072, the severely injured plaintiff testified that he was married, had two small children, and would be unable to engage in athletic pursuits with his son or otherwise participate in normal recreational activities with his children. The Second Circuit Court of Appeals wrote:

> "Where reference to dependent children 'can serve both legitimate and illegitimate purposes, the trial judge must be given some latitude in setting the bounds of propriety.' [Citation.] In permitting the plaintiff to testify that he was married and had two small children, Judge Mishler ruled that such evidence was admissible because it was relevant to the issue of damages. We do not think this was an abuse of discretion." (402 F.2d 585, 591, 37 A.L.R. 3d 1072, 1080.)

Our review of the record in the instant case reveals that there was no undue emphasis upon plaintiff's family circumstances, and that plaintiff's

testimony was relevant to the issue of the extent of his injuries. Accordingly, we cannot say that the evidence of plaintiff's family circumstances was prejudicial, or that the trial court abused its discretion in allowing such testimony and argument. See Annot. 37 A.L.R. 3d 1082 (1971).

Defendant's third allegation of error is that the trial court erred in improperly restricting the cross-examination and impeachment of plaintiff's treating physician, and in excluding from evidence the doctor's entries in the hospital record. At trial, plaintiff's treating orthopedic surgeon, Dr. John Sinning, Jr., was called to testify. He stated that when he first saw the plaintiff in the hospital emergency room shortly after the accident, Mr. LeMaster was in extreme shock, very subdued, but able to answer questions. Under cross-examination, however, Dr. Sinning testified that he did not take a history from the plaintiff either in the emergency room or at any time thereafter. Defendant attempted to examine Dr. Sinning concerning the hospital records, in which Dr. Sinning wrote that the accident "apparently happened when Mr. LeMaster missed a step getting onto a train and slipped under the car." In a *voir dire* examination outside the presence of the jury, the doctor testified that the information would have come from some people who came to the hospital with the plaintiff, "and may well have been their impression of what happened as to one side." In any event, the doctor testified he did not take the history from the plaintiff himself.

Plaintiff successfully objected to the doctor's testimony concerning his entries in the hospital record on the grounds that the entries contained bare hearsay not covered by the treating physician's exception to the hearsay rule. Defendant claims two grounds upon which such testimony should have been permitted at trial. First, defendant claims that since Dr. Sinning stated he didn't take any history concerning plaintiff's accident, it would have been proper to cross-examine and impeach the doctor with his own hospital record entries which contained a history of the accident. The trial court disagreed, ruling that there was no contradictory statement because the doctor testified he never took a history *from the plaintiff*.

■■ A fair reading of the record confirms the trial court's observations. Dr. Sinning's testimony that he did not take a history in this case was in response to questions which asked whether he took a history from Mr. LeMaster, and is consistent with his explanation of the history contained in the entries in the hospital record. The trial court was correct in refusing to allow cross-examination and impeachment under these circumstances. *Young v. Miller* (1967), 79 Ill.App.2d 463, 223 N.E.2d 854, 857.

Second, defendant contends that since Dr. Sinning referred to the

hospital record to refresh his memory on direct examination, defendant's counsel had the right to cross-examine the doctor with respect to any pertinent matter contained in the hospital record.

■■ Whenever a witness utilizes a document to refresh his memory, opposing counsel has the right to inspect the document and use it to cross-examine the witness. In *Justice v. Pennsylvania R.R. Co.* (1963), 41 Ill.App.2d 352, 191 N.E.2d 72, the defendant was not permitted to cross-examine the plaintiff's doctor concerning the notes the doctor relied upon throughout his testimony. Furthermore, the defendant was not given the opportunity to inspect the notes the doctor used to refresh his memory. The appellate court reversed, holding that the trial court's refusal to allow defendant's counsel to examine and use the notes was error. In explanation, the court quoted the general rule that a document may be used in cross-examination in order that the opposing party "may ascertain whether the paper or memorandum used has any legitimate tendency to bring the fact in controversy to the mind of the witness" and to "test the candor and integrity of the witness." (41 Ill.App.2d 352, 355, 191 N.E.2d 72, 73.) In the recent decision in *Tenenbaum v. City of Chicago* (1973), 11 Ill.App.3d 987, 1003, 297 N.E.2d 716, 725, *aff'd in pt., rev'd in pt. & rem.* (1975), 60 Ill.2d 363, 375, Justice Goldberg, in the appellate court, wrote:

> "As regards the hospital history, the authorities establish that plaintiff had the right to examine the memorandum to refresh his recollection and then to testify from his independent recollection as thus refreshed. (*Adamaitis v. Hesser*, 56 Ill.App.2d 349, 354-355, 206 N.E.2d 311.) Plaintiff having done so, it follows necessarily that O'Neil had the right to inspect the memorandum and to cross-examine regarding its use by plaintiff in the recollection process. 'This is clearly the settled law in this state.' (*Justice v. Pennsylvania R.R. Co.*, 41 Ill.App.2d 352, 355, 191 N.E.2d 72.) The jury was entitled to know and to evaluate the source of the revival of plaintiff's recollection."

■■ In the instant case, the record reveals that Dr. Sinning consulted the hospital record only in reference to the skin graft procedures performed by another doctor. The defendant did not attempt to question Dr. Sinning concerning the doctor's use of the hospital record in his testimony, the accuracy of the hospital record entries, or anything else related to demonstrating to the jury the source of the revival of the doctor's recollection. The defendant was in possession of a copy of the hospital record and did not challenge its accuracy. Rather, it is apparent that the defendant's sole purpose for attempting to examine the witness concerning his entries in the hospital record was to introduce hearsay.

The impropriety of such hearsay was determined in *Behles v. Chicago Transit Authority* (1952), 346 Ill.App. 220, 104 N.E.2d 635, wherein an intern testified that he took plaintiff's medical history from someone who brought the plaintiff to the hospital. The trial court refused to allow the intern to testify concerning the plaintiff's medical history. This court affirmed, holding that the hospital record entry of plaintiff's medical history fell clearly within the prohibition of the hearsay rule. We reach the same conclusion in the instant case and hold that the trial court did not err when it refused to allow defendant's cross-examination of plaintiff's treating physician concerning the history contained in the hospital record the physician used during his direct testimony to refresh his memory.

■■ With regard to the exclusion of the hospital records from evidence, the defendant claims error. The defendant alleges that since Dr. Sinning wrote the entries in the record himself, the record was independently admissible as business entries under the rule of *Kimber v. Kimber* (1925), 317 Ill. 561, 572. The court in that case wrote that a hospital record "is admissible upon the same basis as books of account, and before it can be admitted in evidence all persons who make entries in it are required to testify to their correctness." The defendant cites *Healy v. City of Chicago* (1969), 109 Ill.App.2d 6, 248 N.E.2d 679, for the proposition that the fact that Dr. Sinning took the history from someone other than the plaintiff went to the weight, not the admissibility of the records. In *Healy*, the physician testified that he took the information from the plaintiff, and on cross-examination admitted it was possible he received the information from someone other than the plaintiff.

■■ The instant facts are distinguishable inasmuch as Dr. Sinning denied taking the information from the plaintiff and insisted he must have taken the history from someone else. At no time was it intimated that the hospital record contained a history comprised of other than objectionable hearsay. Because the hospital record contained objectionable and unreliable hearsay, and did not qualify under Supreme Court Rule 236 for admissibility as a business record, we believe the trial court was correct in refusing to allow the hospital record into evidence. See *Behles v. Chicago Transit Authority*.

Defendant's fourth allegation of error is that the trial court erred in admitting certain prejudicial evidence, and in giving misleading instructions to the jury based upon the alleged circumstantial involvement of certain third parties to the accident.

The evidence at trial disclosed that the area where the plaintiff sustained his injuries was on a section of defendant Railroad's right-of-way which crossed over property owned by Ralston-Purina Company. The evidence also disclosed that the Nalco Chemical Company, under con-

tract with the defendant, sprayed the weed killer on the West Davenport yard, and that a Mr. Timermann was under contract with the Railroad as an independent scavenger to pick up grain spillage in the yard. In order to clarify the roles of these third parties the plaintiff introduced into evidence certain portions of the contracts between the defendant and these parties. Through this evidence the plaintiff pointed out to the jury that the Railroad and Ralston had an agreement wherein the Railroad was to maintain the tracks on Ralston property where the accident occurred; that the agreement between the Railroad and Nalco provided that the Railroad was to supply either an oil or water base for Nalco to use in mixing its weed killer; and that Mr. Timermann worked under a contract with the Railroad which provided he was authorized to pick up spilled grain and that he was to pay the Railroad for the grain he removed from along the right-of-way.

At the conclusion of trial, the jury was instructed by the trial court that the defendant Railroad had a continuous, nondelegable duty to provide plaintiff with a reasonably safe place to work, and that it would not be a defense that some third person may also have had a duty to maintain the area where plaintiff was injured. Further, the jury was instructed that the "proximate cause" of the accident need not be the only cause but was sufficient if it concurred with some other cause to produce the injury.

Defendant's position at trial and on appeal is that the only issue for the jury was whether the Railroad provided the plaintiff with a reasonably safe place to work under the Federal Employers' Liability Act (45 U.S.C. § 51 *et seq.* (1970)), and therefore, any evidence or instructions concerning the issue of possible third party concurring negligence was totally irrelevant and prejudicial to its cause. Defendant reasons that the jury may have been confused by the introduction of the concurrent cause issue in that the jury may have determined liability on the issue of the maintenance and control of the area where plaintiff was injured, an issue uncontested by the Railroad.

Evidence of facts collateral to the issues of a case is usually deemed to be irrelevant and therefore inadmissible because it is likely to distract the jurors and draw them away from the real issues of a case. (*Standard Manufacturing Co. v. Brons* (1905), 118 Ill.App. 632; 18 Ill.L.&Pr. *Evidence* § 41 (1956).) In some instances, however, evidence of collateral facts is properly admitted where it may be of assistance to the trier of fact in its determination of the truth. It is the responsibility of the trial court, in its sound discretion, to weigh the possible prejudicial effect of such evidence against its value, and strike a reasonable balance. 31A C.J.S. *Evidence* § 162 (1964).

██  Our reading of the record in the instant case reveals that the questioned evidence was helpful in clarifying the ambiguous roles the third parties played in the sequence of events leading to the plaintiff's injuries, and although the evidence was collateral to the issues of the case, it was properly admitted in the discretion of the trial court.

██  Nor were the instructions on these points error inasmuch as the purpose of instructions is to convey to the minds of the jurors the correct principles of law applicable to the evidence submitted to them. (35 Ill. L.&Pr. *Trial* § 191 (1958).) In this case, the evidence submitted to the jury involved possible third party concurring negligence, and the trial court properly instructed the jury as to the law applicable to such facts.

Defendant's fifth allegation of error is that it did not receive a fair trial because the trial court refused to allow it to establish its defense by a full cross-examination of the plaintiff. We shall briefly recount the salient points of plaintiff's testimony on direct examination, the defense theory, and then discuss the questions defendant was prevented from asking Mr. LeMaster on cross- and re-cross-examination.

Plaintiff testified on direct examination that he was supervising a movement of boxcars on a track which ran east and west at the point in question. As the cars approached a grade crossing at Howell Street, he stood on the north side of the track with his lantern so he could warn any approaching traffic that a train was coming. Plaintiff then signalled his crew to move the train forward. No sooner had he signalled when he noticed an automobile approaching the cross from the south at a great rate of speed. Plaintiff crossed to the south side of the track and shone his lantern at the approaching automobile, at which point the car then turned away from the crossing. By this time, the train had entered the crossing and the plaintiff was out of the sight of his crew, which was on the north side of the track. Plaintiff climbed onto the back end of a boxcar so he could set the car's handbrake to prevent the car from running loose should the cars become uncoupled during the movement. As we have already stated, plaintiff's theory of the case was that the boxcar was jolted and then he fell from the boxcar's ladder because of the slippery conditions.

The defense theory was that the plaintiff's fall resulted from his own negligence in crossing over to the south side of the moving train, and then climbing onto a moving boxcar. The Railroad Safety Rules in evidence provided that plaintiff should have remained on the north side of the track so that he would have been in sight of his crew at all times, and still would have been in a good position to have waved away or stopped an approaching automobile. Furthermore, the defense presented two experienced trainmen, Frankville and Brock, who testified that the

usual and customary procedure at the Howell Street grade crossing was for the person protecting the crossing to always be positioned on the north side of the track. Mr. Frankville also testified that it was his custom as a switchman at the West Davenport yards (the site of the incident) to set a handbrake when the boxcar was stopped, in the event he would fall, although he admitted on cross-examination that he had set handbrakes on moving boxcars.

■■ On cross-examination, plaintiff testified to his activities on the evening in question. When the questioning reached the stage where plaintiff said that he crossed the track, defense counsel asked plaintiff whether he had ever before crossed over to the south side to flag down an automobile. Plaintiff said yes. Plaintiff's counsel's objection was sustained and the answer was stricken. We believe that the trial court properly sustained the objection. As was stated in *Herget National Bank v. Johnson* (1974), 21 Ill.App.3d 1024, 1026, 316 N.E.2d 191, 193:

> "The general rule is that evidence of conduct of a person on another occasion or occasions is irrelevant on the question of his conduct on the occasion in issue, except to show habit, state of mind, knowledge or intent and the like."

Whether plaintiff had ever crossed the track before the date of his injury to flag down an automobile was not probative of whether he was in violation of the Railroad Safety Rules on the night of the accident, or whether his alleged negligence on that night caused or contributed to his injuries. Accordingly, we believe that the question was irrelevant and properly excluded by the trial judge in the exercise of his discretion.

Continuing cross-examination, plaintiff admitted being familiar with the Railroad Safety Rules, and that there was no reason he could not have stayed on the north side of the track to signal the approaching automobile. He did say, however, that had he stayed on the north side of the track, the auto could have struck the side of the train.

■■ Defense counsel then asked plaintiff two questions as to what he would have done had he not fallen from the boxcar. Defense counsel first asked how plaintiff planned to get back to the north side of the track, and counsel next asked what plaintiff was going to do after setting the brake. As to the second question, plaintiff responded by saying that he was going to get off the car. Objections to both questions were sustained on the grounds that plaintiff's intended moves were irrelevant to the cause of action and that the subject matter had not yet been opened. On appeal, defendant argues that the subject of intended moves had been raised on direct examination when the plaintiff testified that he was going to position the boxcars in the Ralston warehouse. We begin by noting that what would have happened but for the accidental

fall was irrelevant to the contested issues of the case. Although the plaintiff may have inadvertently entered into this irrelevant area to place his switching activities at the time of the fall in the context of the whole incident, we believe that the defense questions were properly limited by the court. The questions posed were not related to explaining or qualifying the plaintiff's testimony on direct examination. Upon careful consideration, we find that the questions were not relevant to the stated defense theory. The defense theory was that the plaintiff was negligent by being on the wrong side of the track and by climbing onto a moving boxcar ostensibly to set a handbrake. Defendant does not suggest how the plaintiff's intended moves would have been relevant to the defense, and we fail to see the relevance, if any exists, of the two questions pertaining to what the plaintiff would have done had he not fallen from the boxcar and sustained serious injuries.

The cross-examination later entered the topic of how easily boxcars may become accidentally uncoupled, as was mentioned on direct examination. After plaintiff gave an explanation of the coupling mechanism, defense counsel asked this question:

"As a matter of fact, isn't it true, based upon your twenty years of railroad experience, that most of the difficulty is with the cars not uncoupling, is that the pin lifters don't work, that you have to jerk them two or three times?"

Plaintiff's counsel objected on the grounds that plaintiff testified only as to what happened to him that evening, and not as an expert coupling witness, so that the cross-examination was far beyond the scope of direct. The trial court sustained the objection, stating that he felt defendant's question was beyond the scope of direct and was properly a matter of defense. Plaintiff was then permitted to testify that he never had any difficulty uncoupling boxcars on the track where he fell. Defendant argues that it was prejudiced from receiving a fair trial because it was prevented from asking the excluded question, and an offer of proof made at trial by defendant was that plaintiff would have testified that the usual problem was that the boxcars were difficult to uncouple.

■■ Defendant argues that it was improperly restricted from cross-examining the plaintiff with respect to a factual matter which was vital and went to the heart of the railroad's defense. Viewing the record in its entirety, we feel that if the question were so important to the defense, it could have been asked of any of the defendant's expert switching witnesses during the defense case. Defendant apparently chose not to exercise that option and did not pursue the matter further at trial. We find no prejudicial error in the trial court's ruling.

The cross-examination ended shortly thereafter and then plaintiff's

counsel conducted a brief redirect examination with respect to some matters covered on cross-examination. Plaintiff testified that it was the custom and practice of all switchmen to set handbrakes on moving boxcars, regardless of the weather or time. A few other matters were covered. On re-cross-examination, however, defendant attempted to question plaintiff as to the normal custom and practice for switching and setting handbrakes on the track where he was working at the time of the fall. Both questions were beyond the scope of proper re-cross-examination since the topics were not raised on redirect. We believe that the trial court properly sustained plaintiff's counsel's objections to these two questions.

Having reviewed the alleged errors in cross-examination of plaintiff as assigned by defendant, we hold that there were no prejudicial errors committed by the trial court in its rulings on these questions.

■■ Closely related to this issue is defendant's allegation that it did not receive a fair trial because the trial court improperly restricted cross-examination of the plaintiff's expert switching witness, John McGinness. Mr. McGinness testified that he was a switchman for 33 years, and that having examined the tracks at the accident scene, the wheels of a lead car going around the curve where the plaintiff fell would always be caught in a "bind" and produce a jolt which could be felt by a man riding on the car. On cross-examination, the expert witness was questioned concerning his visits to and his observance of railroad switching operations at the accident scene. Defense counsel then posed the following question:

> "Were they [the switching crew McGinness watched] working from the north side of Howell Street or the south side of Howell Street?"

Plaintiff's objection to the question was sustained, and defendant argues on appeal that this ruling was error. The evidence at trial showed that Howell Street ran north and south so that there could not have been either a north or a south side of Howell Street. We believe that the question was properly excluded by the trial court.

■■ Defendant's sixth contention on appeal is that the plaintiff's use of cumulative evidence of his injuries constituted reversible error. The defendant lists eight instances whereby plaintiff described the nature of his injuries to the jury: (1) the plaintiff's own testimony; (2, 3 & 4) the testimony of plaintiff's three physicians; (5) photographs of the plaintiff's injuries during healing; (6) x-rays of each injury; (7) an in-court demonstration and (8) posed photographs. It is argued that the flood of injury evidence was unduly repetitious and served to arouse the jury's sympathies against the Railroad.

We have read the record carefully and viewed the black and white and color photographs, and feel that there was no prejudice to the defendant resulting from the combination of the testimony of the plaintiff and his physicians, the photographs taken during healing, and the x-rays. The admission and use of such evidence is within the sound discretion of the trial court. (*Hedrich v. Borden; Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill.App.2d 253, 200 N.E.2d 149, *aff'd* (1965), 33 Ill.2d 326, 14 A.L.R. 3d 860, *cert. denied* (1966), 383 U.S. 946, 16 L.Ed.2d 209, 86 S.Ct. 1204.) We feel that discretion was not abused in the instant case. We are concerned, however, with the in-court demonstration and the posed photographs.

During the plaintiff's case-in-chief, Mr. LeMaster was called as a witness and was asked by his attorney to undress down to the bathing suit worn for the occasion so as to demonstrate his disability in disrobing and use of his prostheses. After listening to arguments out of the hearing of the jury on defendant's objection, the trial court ruled that the disrobing would be proper because the jury has to evaluate the case and is therefore entitled to see the plaintiff's disability. The plaintiff removed the business suit he had been wearing which covered his prosthetic limbs, and then removed his prosthetic arm and leg so that he appeared before the jury wearing a bathing suit and a t-shirt, leaning on a cane. Mr. LeMaster's injuries and stumps were visible to the jury. He then reversed the process. At the conclusion of the redressing, the court's bailiff assisted the plaintiff in buttoning his shirt cuff.

Toward the end of his case-in-chief, plaintiff's counsel offered into evidence a set of nine photographs which fairly depicted the plaintiff's appearance much as it was during the in-court demonstration and exhibition. The defendant objected on the grounds that the photographs had no additional probative value than what was already in evidence, and that they would only inflame the passions of the jurors. After discussion out of the hearing of the jury, plaintiff's counsel withdrew two photographs and the remaining seven were admitted into evidence over objection. Of the seven, four depicted the plaintiff with and without his prosthetic limbs, front and side views, and the remaining three consisted of two close-ups of plaintiff's foot and one close-up of his arm stump.

On appeal, defendant contends that the use of the photographs in addition to the in-court demonstration constituted reversible error because the primary purpose of this cumulative medical evidence was to arouse the sympathies of the jurors. The defendant cites a number of cases which discuss the improper use of evidence for "dramatic effect, or emotional appeal, rather than factual explanation useful to the reasoning of the jury" (*Smith v. Ohio Oil Co.* (1956), 10 Ill.App.2d 67, 77, 134 N.E.2d

526), and concludes that in this case either the trial court abused its discretion in permitting such evidence to be used, or the plaintiff's actual use of the evidence proved to be an abuse of the trial court's proper ruling. This court stated the appropriate rule for such cases in *People v. Van Bussum* (1966), 72 Ill.App.2d 428, 437, 219 N.E.2d 695, where it held "[t]he admission and use of this evidence was within the discretion of the trial court. It is reviewable only in cases of an abuse of such discretion, or when such evidence is irrelevant or immaterial, or when it is used principally for its emotional effect."

■■ To begin with, there is no issue as to the relevance of materiality of the in-court undressing or the posed photographs. The exhibition of a stump or wound and the demonstration of a disability have both been approved of in personal injury cases subject to the discretion of the trial court. The court in *Darling* wrote that "[t]he exhibition of an injury to a jury is within the discretion of the Trial Court—a party may demonstrate the nature and extent of the injury, or the disability resulting therefrom, and it is common and correct practice to exhibit the wound or injury to the jury, even where there is no dispute as to the fact and nature of the injury." (50 Ill.App.2d 253, 325-26.) Such observations are permitted because they are useful in aiding a jury to understand the exact nature and extent of the claimed injury to be evaluated. In the instant case, it is clear that the plaintiff's demonstration of his disability and the exhibition of his stumps and prosthetic limbs accurately portrayed his injuries to the jury.

Similarly, photographs of injuries are permitted in evidence "when they may be helpful to an understanding of the facts, are material, accurate, relevant and correctly portray what they purport to show." (*Hedrich v. Borden Co.* (1968), 100 Ill.App.2d 237, 249.) The posed photographs of plaintiff's injuries were accurate and correctly portrayed his condition to the jury. See *Kallas v. Lee* (1974), 22 Ill.App.3d 496, 317 N.E.2d 704.

The problem in this case, however, is that the jury was allowed to see the series of photographs which portrayed the plaintiff as he appeared during his undressing demonstration in addition to viewing the plaintiff's demonstration. We must first examine the actual use of the photographs in the context of the case and then determine whether the use was proper. The questionable photographs in evidence were used twice at trial. Their first use was when plaintiff's counsel used them during his closing arguments to refer to the plaintiff's permanent condition, and their second use was when they were given to the jury to take into the jury room.

■■ The use of exhibits by counsel to illustrate his closing argument

is proper so long as the exhibits are not misleading to the jury. (*Caley v. Manicke* (1962), 24 Ill.2d 390, 182 N.E.2d 206.) Counsel should be allowed the widest possible latitude in his closing argument, subject to the restrictions of precedent and decorum, and should be permitted the opportunity to reasonably and honorably argue his case to the jury from the evidence. (*Rusick v. Stuart* (1964), 50 Ill.App.2d 69, 200 N.E.2d 6 (abstract opinion).) The record reveals that plaintiff's counsel used the photographs in issue during his opening and closing arguments to review the evidence concerning plaintiff's permanent physical condition. Counsel pointed to the photographs seven times during opening argument and six times during closing argument while commenting on plaintiff's severe injuries. We have reviewed these comments in the record, and note that the photographs were used in a fashion consistent with effective advocacy, and was not outrageous or otherwise prejudicial to defendant's right to a fair trial. Also, we observe that defendant failed to object to the plaintiff's use of the photographs during closing argument, which indicates that the argument was not improper. (See *Department of Public Works & Buildings v. Mitchell* (1974), 19 Ill.App.3d 1083.) Accordingly, we hold that the use of the photographs in this fashion was not improper.

The use of photographs by a jury in its deliberations is subject to the general rule that it is within the discretion of the trial court to permit the jury to take into its deliberations those objects properly admitted into evidence. (*Kaspar v. Clinton-Jackson Corp.* (1969), 118 Ill.App.2d 364, 254 N.E.2d 826; 35 Ill.L.&Pr. *Trial* § 286 (1958).) As with the introduction of evidence, it is the peculiar function of the trial court to balance the probative value of the evidence against its possible prejudicial effect; a reviewing court will not disturb the ruling unless there has been an abuse of discretion in the balancing which results in prejudice to a party. (*Darling.*) The question, therefore is whether the trial court abused its discretion by permitting the jury to use the photographs in its deliberations.

The probative value of the photographs of plaintiff with and without his prosthetic limbs was that they were of use to the jury inasmuch as the photographs accurately portrayed the plaintiff's physical condition without distortion or other distractions. Defendant argues that the photographs were of no informative use to the jury because the plaintiff's physical condition had been both orally described and physically displayed to the jury at trial so that the photographs were merely cumulative of the other evidence and could only have aroused the emotions and sympathies of the jurors to the prejudice of the defendant.

In *Sparling v. Peabody Coal Co.* (1974), 59 Ill.2d 491, 322 N.E.2d 5,

the Illinois Supreme Court considered a very close factual situation. Therein, the plaintiff exhibited the burns and scars on her legs and body to the jury and also submitted into evidence a series of photographs which depicted the appearance of her feet and legs at the time of trial. The defendant in that case contended that the trial court erred in the admission of the photographs into evidence, and that it was error to have permitted the jury to have taken the photographs into its deliberations. Specifically, it was argued that since the photographs portrayed only what the jury had already seen, the photographs were testimonial in nature and their presence in the jury room conferred an unfair advantage on plaintiff. The court noted that there was no contention that the photographs were inaccurate, and that their admission into evidence and use by the jury was within the sound discretion of the trial court. Reversing on other grounds, the court ruled that the trial court did not err in this respect.

The trial court's balancing of probativeness against possible prejudice is "so much a matter where wise judges in particular situations may differ that a lee-way of discretion is generally recognized." (McCormick on Evidence § 152 at 320 (1954).) Other trial courts faced with similar problems have been affirmed on appeal. In *Mason v. Bon Marche Corp.* (1964), 64 Wash. 177, 390 P.2d 997, the elderly plaintiff's hair fell out as a result of a permanent she had at defendant's beauty shop. At trial, the plaintiff exposed her bald head to the jury *and* offered into evidence a photograph of her bald head. The trial court's discretion in allowing the photograph into evidence was upheld by the Washington Supreme Court. In *Garozynski v. Daniel* (1947), 190 Md. 1, 5, 57 A.2d 339, 341, the court wrote:

> "There is no merit in the appellant's contention that the court erred in admitting a photograph of the plaintiff in a cast, and in permitting the exhibition of the plaintiff's scars to the jury. *These matters 'must be left largely to the trial court's discretion.'*" (Emphasis added.)

Of particular note is the Wisconsin Supreme Court's opinion in *Schueler v. City of Madison* (1971), 49 Wis. 2d 695, 183 N.W.2d 116. In that case, the trial court *excluded* injury photographs from evidence after expert medical testimony was given, and on appeal, the court wrote:

> "Judge Bardwell pointed out that the pictures were 'gruesome' and that much of the probative value of the pictures was merely cumulative to the oral testimony of Dr. Huffer. He therefore concluded that the possible prejudicial effect of the photographs outweighed their probative value. *This constituted a proper exercise of judicial discretion, which must be sustained although*

*reasonable judicial minds could differ.*" (49 Wis. 2d 695, 719-20, 183 N.W.2d 116, 130.) (Emphasis added.)

The case was reversed on other grounds and remanded for a new trial. The judge at the new trial was specifically cautioned by the reviewing court that it should consider the photographs anew at trial, and balance the possibilities of prejudice against the probative value of the photographs.

Although the problem in the instant case is the use of the photographs in addition to the exhibition and demonstration, other courts have considered close factual situations without disapproval, expressing opinions as to the separate use of photographs and a demonstration. In *Hanberry v. Fitzgerald* (1963), 72 N.M. 383, 384 P.2d 256, the plaintiff injured his ankle and introduced 21 close-up photographs of the ankle taken over a 6-month period, and in court he removed his elastic stocking so that the jury could see the difficulty he had with the stocking and the injured ankle. The New Mexico Supreme Court cautioned that so many photos could be prejudicial but not enough to warrant reversal, and the elastic stocking removal demonstration was not an abuse of discretion. In *South Highlands Infirmary v. Camp* (1965), 279 Ala. 1, 180 So. 2d 904, 14 A.L.R. 3d 1245, the plaintiff dressed in shorts to show her thigh scars to the jury, and also introduced photographs of her injuries into evidence. The Alabama Supreme Court ruled that there was no error in either the demonstration or the photographs.

Defendant has not cited, nor have we found, any cases in which the trial court's discretion was found on appeal to have been abused by allowing the jury's use of photographs which depicted the subject of an in-court demonstration of disabilities or exhibition of injuries. *Cf. Burger Chef Systems, Inc. v. Govro* (8th Cir. 1969), 407 F.2d 921.

In the instant case, some of the photographs depicted the plaintiff with a smile on his face, some with a neutral expression. None of the photographs in question showed Mr. LeMaster with an expression of agony or pain, nor with blood or draining stumps. The photographs accurately represented the extent of the plaintiff's injuries, without elaboration or passion. Although the photographs were not used by an expert medical witness, we cannot say that the photographs could not have been of use to the jury in understanding the bulk of medical testimony concerning the plaintiff's condition. For example, plaintiff's orthopedic surgeon testified that the plaintiff's left forearm had a good stump inasmuch as the healed stump had a conical shape. Although the jury may have seen the stump briefly during the demonstration, the photographs provided the jury with the opportunity to see for themselves the conical stump and the other features of plaintiff's injuries of which the doctors spoke.

■■ The trial judge saw Mr. LeMaster's demonstration and the photographs, and there is no indication that he felt the photographs would 'have an adverse effect upon the jury. This court does not feel that the jury's use of the photographs which replicated what the jurors saw in court was prejudicial to the defendant's right to a fair trial. The jury's use of exhibits during its deliberations rests within the discretion of the trial court. We cannot say that discretion was abused in the instant case, nor can it be said that the evidence was used primarily to arouse the sympathies of the jurors. Accordingly, we find there was no error in this regard.

■■ The defendant's seventh allegation of error is that the trial court erred by refusing to permit testimony concerning the method of reducing future earnings to their present cash value as set forth in *Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill.2d 164, 133 N.E.2d 288, *cert. denied* (1956), 352 U.S. 833, 1 L.Ed.2d 53, 77 S.Ct. 49. One element of plaintiff's damages is future wages which the plaintiff will be prevented from earning because of his injuries. (*Eilers v. Peoria Ry. Co.* (1916), 200 Ill.App. 487.) Rather than awarding the lump sum of future earnings to the plaintiff as part of the verdict awarded, the jury is instructed to reduce the lump sum of lost future earnings to its present cash value. (*McCray v. Illinois Central R.R. Co.* (1957), 12 Ill.App.2d 425, 438, 139 N.E.2d 817.) The reason for reducing future earnings to their present cash value figure is that if a plaintiff is awarded the lump sum of his projected future earnings, he could invest that money, draw from it monthly the same amount as the wages he would have earned but for his injuries, and at the end of his work-life expectancy he would be able to draw money that was earned as interest.

> "The goal of the personal injury award for this element of damages should be to give the plaintiff that sum of money which, if invested in reasonably safe investments, will return to the plaintiff the amount of the decrease in his earning capacity over the period * * * of his life (or, according to some courts, work) expectancy prior to the injury and—at the termination of that period—be reduced to no value." (22 Am. Jur. 2d *Damages* § 96, at 141 (1965).)

To that end, Illinois Pattern Jury Instruction 34.02 (Civil, 2d ed. 1971) defines "present cash value" as "the sum of money needed now, which, when added to what that sum may reasonably be expected to earn in the future, will equal the amount of the earnings at the time in the future when the earnings would have been received."

The major problem arising in connection with the reduction of future earnings to their present cash value is that the jury must be instructed in

the concept and be provided expert actuarial testimony as to the procedure for arriving at the present cash value figure. There are two methods by which the actuarial witness can instruct the jury as to the procedure. First, the actuarial witness may explain the procedure to the jury using the actual amount of the plaintiff's wages as an example. The second method is for the actuarial witness to use a neutral figure, such as $1, and explain to the jury the process by which that $1 would be reduced to its present cash value. The jury would be instructed to make the calculations of the present cash value based upon what it determines to be the amount of lost future earnings.

In *Allendorf v. Elgin, Joliet & Eastern Ry. Co.*, the Illinois Supreme Court ruled that the neutral figure approach is to be used in Illinois courts, because "[t]o allow an actuary to testify to figures, which the jury might adopt as real, carries with it the danger that the jury will accept them not only as the actuary's explanation of his process of computation, but also as proof of contribution and life and work expectancy." (8 Ill.2d 164, 177.) In the instant case, defendant alleges that the court compelled the actuarial witness to use the actual figures in evidence, that the figures used were speculative of the real figures, and that the jury may have been misled by the testimony so as to amount to reversible error. We disagree. Although it is clear that the proper method for the reception of actuarial testimony is through the use of neutral figures, the fact that a jury is made aware of a number of yearly salaries and interpretations as to the length of plaintiff's expected working life does not necessarily constitute reversible error. The court in *Allendorf* concluded:

> "The ultimate question, of course, is not whether the trial was scrupulously free from error, but whether any error which occurred operated to the prejudice of the defendant. It is our opinion that the result in this case would have been no different even had the actuary employed neutral figures in her testimony. The defendant has been afforded a fair trial free of reversible error. The judgment is affirmed." 8 Ill.2d 164, 182.

In the case at bar, the trial court properly instructed the jury as to the proper method for reduction of future earnings to their present cash value and the jury was made aware that the actuarial witness was not stating the exact amounts to be awarded, but was only describing the general principles for reduction of an amount to its present cash value using the figures in evidence as examples. Defendant was able to competently argue to the jury from the figures most favorable to its position, as well as to have the actuarial witness compute reduced cash values at interest rates most favorable to the defendant. It is our opinion that defendant was not prejudiced by the actuarial witness's failure to use

a neutral dollar figure in describing the reduction of the plaintiff's future earnings to their present cash value.

The defendant's eighth allegation of error concerns the verdict of $1,000,000 upon which judgment was entered. The defendant Railroad recognizes that plaintiff received severe injuries, but contends that the damages awarded are excessive when compared with judgments in other cases which have been reduced because of excessiveness even though the severity of the injuries in those cases exceeds the severity of Mr. LeMaster's injuries. Defendant further contends that the verdict is the result of sympathy for the plaintiff, and prejudicial passion against the Railroad.

■■ ·The test to be used when examining a verdict challenged as being excessive is "whether or not the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience." (*Barango v. E. L. Hedstrom Coal Co.* (1956), 12 Ill.App.2d 118, 138, 138 N.E.2d 829.) It is not believed that the propriety of a verdict can be determined from a comparison with verdicts awarded in other cases because each case must be considered on its own facts; the determination of the amount of damages is within the province of the jury. (*McNellis v. Combustion Engineering, Inc.* (1973), 13 Ill.App.3d 733, 744-45, 301 N.E.2d 96, *aff'd* (1974), 58 Ill.2d 146.) It is the aim of the law to attain a reasonable balance between the amount as damages and the extent of the injuries, and there is no precise rule by which an award of damages can be fixed in an action for personal injuries because such compensation does not lend itself to mathematical computation. *Lau v. West Towns Bus Co.* (1959), 16 Ill.2d 442, 452-53.

■■ The evidence in the case indicates the extent of plaintiff's injuries, pain, and suffering. When plaintiff was admitted to the emergency room of Mercy Hospital, Davenport, Iowa, he was in extreme shock, almost dead, a severed arm and a leg attached to his body by only scraps of skin. A team of surgeons operated on him for about 5½ hours, first to save his life, and then to try to put him back together as best as they could. Seven pints of blood were given to plaintiff during the operation. After the initial operation, plaintiff was cared for in the intensive care unit. About 36 hours after the accident, plaintiff almost died; his blood pressure disappeared and he could not respond. After treatment with a concentrated salt solution, more blood, oxygen, and large doses of cortisone, plaintiff's condition improved, and then stabilized. The stumps healed reasonably well for about a week, but then severe infection set in at the amputation sites. Pockets of pus with a terrible odor developed, and dead skin on the stumps turned hard, crusty, and black. By the end of 2 weeks, Mr.

LeMaster had been given about 17 pints of blood. It was noted that in addition to the traumatic amputation of an arm, a leg, and some toes, he had also sustained a broken rib, a broken collarbone, a bruised lung, and several fractures of his remaining foot as a result of the accident.

As plaintiff's condition improved, the stumps were prepared to accept skin grafts. The preparation was done by treating the stumps with a solution of silver nitrate, which dissolves dead tissue. Fresh dressings were soaked in the silver nitrate solution and then applied to plaintiff's wounds. Between four and six hours later, the dressings were changed so that some dead tissue would be removed from the sites. Besides the pain involved with the constant changing of dressings and the exposure of raw flesh and muscles, the silver nitrate solution had the effect of staining plaintiff's live tissue and anything to which the flaking dead matter came into contact.

Mr. LeMaster also contracted hepatitis. Then, on the 43rd day, he had a grand mal seizure such as is characterized by epilepsy. For a minute or two, his remaining limbs shook violently, he lost consciousness, and he did not breathe. The doctors attributed the seizure to the toxic state of his body, the theory being that the poisonous substances in his body short-circuited his brain, causing the seizure. After a few months, Mr. LeMaster was also afflicted with a pulmonary embolism, a blood clot in his lung. Plaintiff testified that he coughed up bright red blood at that time.

A number of skin graft operations were performed on plaintiff. Live skin was removed from intact areas of plaintiff's body and then laid onto the raw surfaces so that the skin would take root and form a cover over the raw muscles.

After the skin graft operations at Mercy Hospital, plaintiff was transferred to the Iowa Methodist Hospital in Des Moines for further treatment. His stumps were cared for and then surgically trimmed in additional operations so prosthetic appliances could be fitted to them. After a period of healing, the appliances were fitted and Mr. LeMaster learned to use them. Infection, draining, and blisters at the stump sites periodically interfered with his use of the prosthetic arm and leg.

During the year following the day of the accident, Mr. LeMaster was in and out of the two hospitals, spending altogether about 8 of the 12 months in a hospital. Throughout the long periods of healing, he suffered the intense pain and discomfort which accompany such severe injuries. Phantom pains also afflicted Mr. LeMaster. He would reach to scratch an itch on his fingers or leg, only to realize that those extremities were no longer parts of his body.

Before the accident, Mr. LeMaster enjoyed ice skating, dancing, hunt-

ing, fishing, and bowling. After the accident, he was unable to engage in any of these activities. He is able to get around with his prosthetic appliances, but it is awkward. He is no longer able to work. His body is disfigured as a result of his injuries.

Plaintiff's actual monetary damages exceeded $180,000. Pretrial medical expenses were $21,704.83, and pretrial lost earnings were $15,654. Reduced to their present cash value, his future earnings would be about $140,000, and his future medical expenses about $3,500. Plaintiff's work-life expectancy at the time of trial was about 18 years.

Having considered the evidence of plaintiff's severe injuries and losses, we reach the same conclusion as did our Supreme Court in the FELA case of *Raines v. New York Central R.R. Co.* (1972), 51 Ill.2d 428, 444, 283 N.E.2d 230, *cert. denied* (1972), 409 U.S. 983, 34 L.Ed.2d 247, 93 S.Ct. 322:

> "One cannot certainly assess in financial terms these human tragedies, but one can conclude that the award here was not excessive."

The award is not excessive as to shock the judicial conscience, and we cannot say the size of the verdict is the result of prejudice or passion on the part of the jury. (See *Wells v. Web Machinery Co.* (1974), 20 Ill.App. 3d 545, 315 N.E.2d 301.) The verdict will not be reduced or set aside.

In conclusion, we have considered defendant's ninth and final allegation that the cumulative effect of all the alleged trial court errors and the alleged instances of plaintiff's counsel's misconduct deprived defendant of a fair trial. The record reveals a hard-fought adversarial contest between able and well-matched counsel presided over by an impartial trial judge. We feel that a fair trial was had in this cause. See *Dinwiddie v. Siefkin* (1939), 299 Ill.App. 316, 329-30, 20 N.E.2d 130.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McNAMARA and MEJDA, JJ., concur.